**Ronald GORDON, et al., Plaintiffs,**

v.

**Nelson Bunker HUNT, et al., Defendants.**

**No. 82 Civ. 1318(MEL).**

United States District Court, S.D. New York.

Sept. 18, 1987.

Deutsch & Frey, New York City, for plaintiffs; Herbert I. Deutsch, Ganine Gambale, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for ContiCommodity Services, Inc., ContiCapital Management, Inc., ContiCapital Ltd.; Richard A. Rosen, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for Nelson Bunker Hunt, William Herbert Hunt, Lamar Hunt.

Debevoise & Plimpton, New York City, for ACLI Intern. Commodity Services.

Rogers & Wells, New York City, for Merrill Lynch, Pierce, Fenner & Smith, Inc. ACLI International Commodity Services.

Sullivan & Cromwell, New York City, for Bache Halsey Stuart Shields, Inc. Bache Group, Inc.

Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, Washington, D.C., for Intern. Metals Inv. Co., Ltd.

Baer, Marks & Upham, New York City, for Commodity Exchange, Inc.

Sidley & Austin, Chicago, Ill., for Continental Grain.

Parker Auspitz Neeseman & Delahanty, P.C., New York City, for Walter M. Goldschmidt.

LASKER, District Judge.

In 1983 a class was certified in this action which concerns the alleged manipulation of the silver and silver futures market in 1979–1980. The class was limited to persons who had sold silver futures contracts short on the Commodity Exchange, Inc. ("Comex") during a three-week period in August 1979. Various defendants [1] now move to decertify the *Gordon* class, or, in the alternative, to limit the class to the customers of those exchange member brokerage firms that have, by September 15, 1987, provided a complete list of the names and addresses of their customers who are members of the *Gordon* class. Defendants claim that class representative Ronald Gordon has failed to meet his obligations to identify promptly and thoroughly the names and addresses of the class members he represents, and that as a result, notice to the class members will be incomplete and inadequate. They argue that, unless the class is decertified or limited in scope to

---

1. The moving defendants are: ContiCommodity Services, Inc., ContiCapital Management, Inc., and ContiCapital Limited (collectively "the Conti defendants"), Norton Waltuch, Merrill Lynch, Pierce, Fenner & Smith, Inc., ACLI International Commodity Services, Bache Halsey Stuart Shields, Inc., Bache Group, Inc., Nelson Bunker Hunt, William Herbert Hunt, Lamar Hunt, International Metals Investment Co., Ltd., Commodity Exchange, Inc., Continental Grain, and Walter M. Goldschmidt.

those members who can be mailed actual notice, the requirements of Fed.R.Civ.P. 23 and the due process rights of the absent class members will be violated and any final judgment in this case may be subject to collateral attack by unnotified class members. Finally, defendants contend that the alleged difficulty in identifying class members also requires decertification on the basis of unmanageability and inadequacy of representation. The motion is denied.

## I. *History of Gordon Class Certification and Notice*

The *Gordon* class was certified on August 31, 1983. The class was defined to include all persons who 1) sold silver futures contracts short on Comex during the period August 8, 1979 through and including August 30, 1979, and were net short at the end of any trading day during that period; and 2) liquidated any of those short silver futures positions on Comex during the period August 9, 1979 through and including September 4, 1979. Defendants, their families, or anyone claiming directly or indirectly for the benefit of any defendant, were excluded from the class. Gordon was certified as class representative.[2]

The issue of class notice was first discussed in August 1983, when the parties submitted proposed class certification orders. Gordon's proposal provided for the submission of a form of notice within thirty days after the filing of the certification order.[3] In contrast, the two proposed orders submitted by the Hunt defendants and various other defendants led by the Conti defendants omitted any provision for class notice.[4] The Hunt defendants specifically opposed prompt class notice, arguing that

[i]n view of the large number of factual matters which the Court noted that it could not resolve on the present record, many of which necessarily would impact both upon the scope of those entitled to notice and upon the form of notice to be given, we believe the appropriate course is to defer consideration of the notice issue until a later date.[5]

The certification order entered by the court did not require immediate class notice.

In July 1985, defendants themselves, after having initially opposed early notice to the class, began to press for it. At a hearing held on various class notification issues on November 7, 1985, the court advised *Gordon* counsel to "[g]et started on [the] search" for the names and addresses of class members.[6] Gordon then retained Shareholder Communications Corporation ("SCC") to begin the process of identifying and locating class members.[7]

From July 1985 to July 1987, little progress was made on the class member search. On July 10, 1987, an order was entered requiring *Gordon* counsel to file a report by August 15, 1987, "describing the steps ... taken concerning the identification and notification of class members."[8] This order also required that notice to the *Gordon* class be mailed together with notice to the more broadly defined settlement class which had been conditionally certified on May 28, 1987 for the purposes of class relief relating to the settlement between defendant Banque Populaire Suisse ("BPS") and the plaintiffs in both *Gordon* and *Korwek v. Hunt*, 84 Civ. 7934(MEL).[9] Thus, notice to both the *Gordon* class and the BPS settlement class was to be mailed to "all members of the Settlement Class who can be identified with reasonable ef-

2. Affidavit of Richard A. Rosen In Support of Motion to Decertify Class ("Rosen Affidavit") at Exhibit K, Order of August 31, 1983.

3. Rosen Affidavit at Exhibit H, Deutsch Proposed Order at ¶ 3.

4. Rosen Affidavit at Exhibits I and J, various defendants' proposed counter-orders.

5. Rosen Affidavit at Exhibit I, Letter to the Court from Hunt Defendants, August 5, 1983 at p. 7.

6. Rosen Affidavit at Exhibit O, Transcript. of Hearing, November 7, 1985 at p. 25.

7. Rosen Affidavit at Exhibit F, Letter to Herbert I. Deutsch from SCC, April 6, 1987.

8. Rosen Affidavit at Exhibit A, Order of July 10, 1987 at ¶ (a).

9. *Id.* at ¶ (d).

fort" by August 15, 1987, and that notice was to be published in The New York Times, The Chicago Tribune, and the national edition of the Wall Street Journal on the same date.[10]

After requesting and receiving an extension of time until September 15, 1987 to mail and publish notice and to file a final status report, Gordon submitted an interim status report on August 17, 1987. That report stated that plaintiffs had "contacted, or attempted to contact, all members of the COMEX, the CBOT and MidAmerica Exchanges" and that they had so far received over 24,000 names and last-known addresses which were being entered onto computer tape.[11] Although the July 10th order had called for a description of efforts made to contact all futures contracts merchants ("FCMs") "including *but not limited* to clearing members" [12], the interim status report did not refer to any efforts to contact non-clearing member FCMs.

On September 15, Gordon filed a final status report. According to this report, plaintiffs have contacted or tried to contact every clearing member and Futures Commission Merchant ... of each of the three exchanges in the United States ..., and every non-clearing FCM in the United States who is shown on the records of the clearing members (through which they would have to have cleared their trading) as having traded silver futures on these exchanges during the Period [July 1979 through March 1980].[13]

The report states that, after removal of duplicates and errors, Gordon has compiled a list of 17,629 names and last known addresses of persons and companies trading silver futures during the relevant period. Finally, the report indicates that the esti-

mated size of the group which Gordon must contact falls between 12,000 and 18,000 persons.[14]

## II. *Requirements of Due Process and Rule 23*

At the outset, it is noted that defendants bear a heavy burden to prove the necessity of either the drastic step of decertification or the less draconian but still serious step of limiting the scope of the class. Clearly, the requirements of due process and Rule 23 oblige the court to protect the interests of absent class members who may wish to opt out of the class or appear through separate counsel by directing "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," Fed.R.Civ.P. 23(c)(2); *see Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173, 94 S.Ct. 2140, 2150, 40 L.Ed.2d 732 (1974) ("Individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort."). However, there is also a paramount duty to protect the interests of the class as a whole and not to disenfranchise any part of the class unless the facts require it.

Defendants argue that Gordon's efforts to identify class members have been inexcusably dilatory, leading to "a massive failure to comply with Rule 23." [15] Defendants claim, *inter alia* that 1) Gordon failed to contact any non-clearing member FCMs until after defendants brought on this motion by order to show cause, and that even now not all of them have been contacted; 2) Gordon failed to contact all exchange-member FCMs, including some clearing

---

**10.** *See* Order of May 28, 1987 at ¶¶ (e)–(f). The BPS settlement class includes, with certain restrictions, all persons who sold silver futures contracts short on any commodity exchange in the United States from July 1979 through March 1980. *Id.* at ¶ (b).

**11.** Rosen Affidavit at Exhibit C, Plaintiffs' Interim Status Report at p. 1.

**12.** Rosen Affidavit at Exhibit A, Order of July 10, 1987 at ¶ (a) (emphasis added).

**13.** Plaintiffs' Status Report on Class Notice at 2 (September 15, 1987) ("Final Status Report").

**14.** Affidavit of Herbert I. Deutsch in Opposition to Motion to Decertify Class at ¶¶ 103–05 (dated September 10, 1987) ("Deutsch Affidavit").

**15.** Reply Affidavit of Richard A. Rosen In Support of Motion to Decertify Class at ¶ 2 (Sept. 14, 1987).

FCMS; 3) Gordon's failure to identify class members promptly lead to the destruction of numerous FCM records; and 4) even those FCMs which have been contacted have not provided complete information. Finally, at oral argument defendants claimed that Gordon's calculation of the size of the group to which notice must be sent is incorrect, asserting that the group may be much larger than Gordon's estimate.

█ Defendants have not met their burden of proving noncompliance with Rule 23. First, responsibility for the delay in class notification must be shared at least in part by the defendants. As noted above, defendants successfully opposed class notification at the time the class was certified. Furthermore, although defendants may not have been obligated to pitch in and help out Gordon in the class search, the failure of four of the defendant FCMs to produce their customer lists until after the August 15th date originally set by the court for compliance undercuts their argument that only Gordon has been dilatory.[16]

Second, and more importantly, although Gordon may not have proceeded with undertaking the search with maximum speed and precision, perfection is never possible in such a venture, and the final result of the protracted search appears to be adequate. After entry of the July 10, 1987 Order, Gordon pursued the class search with renewed vigor. By August 17, 1987 Gordon had contacted or attempted to contact all the exchange members. By September 15, 1987 Gordon had fully complied with the terms of the July 10th order by also contacting all the non-clearing member FCMS.[17] As indicated above, Gordon has now compiled a list of 17,629 names and addresses of silver traders during the relevant time period. It is anticipated that another 200 class members will be contacted directly by four FCMs who chose to mail to their own customers.[18]

Based on the figures discussed above, Gordon argues that he has in fact obtained the names and last-known addresses of all or almost all of those persons who traded silver futures contracts from July 1979 through March 1980, because a reasonable estimate is that this group consists of about 18,000 persons, based on Commodity Futures Trading Commission ("CFTC") statistics on the total number of commodity accounts during that period and the percentage of commodity contracts traded attributable to silver.[19] (It should be noted again that although the *Gordon* class is

16. *See* Deutsch Affidavit at ¶¶ 78–79.

17. Gordon provided a reasonable explanation for his earlier failure to contact non-clearing FCMs: he did not contact the nonclearing member FCMS until after receiving the records of the clearing members (through which the nonclearing members must have traded) because he identified those non-clearing FCMS which traded silver by a computer run matching all customers provided by the clearing members against the list of all FCMs reported by the CFTC during the relevant time period.

18. Final Status Report at 2–3.

19. Gordon arrived at his estimate of an upper-range of 18,000 by the following calculation: First, based on two expert estimates, Gordon approximated that the total number of commodity futures accounts in 1979–1980 was between 116,000 and 150,000. Second, he used Commodity Future Trading Commission statistics to calculate that the volume percentage of all commodity contracts attributable to silver was twelve percent in 1978–1979, and two percent in 1979–1980. Dividing the first set of figures by

the second, Gordon concluded that between 12,000 and 18,000 persons traded silver in 1979–1980. This methodology is not foolproof: the fact that a certain percentage of all commodity contracts traded were silver contracts does not necessarily imply that the same percentage of all traders were silver traders. In theory, at least, the volume of silver contracts traded could be attributable to a larger group of traders each trading small amounts of silver. However, Gordon has supported his calculation with empirical evidence from the records of the four defendant FCMs that six to ten percent of their total commodity customers traded silver. *See* Deutsch Affidavit at ¶¶ 103–105. Finally, it is noted that although Gordon concludes that "*the putative class* must fall between 12,000 and 18,000 persons," *id.* at ¶ 104 (emphasis added), this estimate really refers to the total number of silver traders in 1979–1980, of which the *Gordon* class itself, which, as discussed above, is limited to those persons were net short on silver future contracts in August 1979, must in fact be a subset.

narrowly defined to include only those persons who were net short on silver contracts at the Comex in August 1979, notice to the *Gordon* class will be mailed to a larger group because it will be included with the notice sent to the much broader BPS settlement class in *Gordon* and *Korwek*). At oral argument, defendants criticized the methodology used to calculate the size of this group and suggested that it may in fact be larger. However, Gordon's estimate is at least reasonable and is at least based on undisputed statistics and data gleaned during the class search. Defendants, on the other hand, have provided no evidence to support their assertion that this group is significantly larger than 18,000 in size. In sum, defendants have failed to establish that Gordon's efforts to locate class members for individual notice has been unreasonable or inadequate.

Finally, in regard to those class members who cannot be identified because of destroyed records or any other reason, Rule 23 instructs that class members who cannot be identified through reasonable effort must be given "the best notice practicable under the circumstances." Here, in addition to mailing notice to the silver traders who have been identified, Gordon will publish notice in The New York Times, The Chicago Tribune, and the national edition of the Wall Street Journal. This combination of mailed notice to all class members who can be identified by reasonable effort and published notice to all others is the long-accepted norm in large class actions, *see e.g. Weinberger v. Kendrick*, 698 F.2d 61, 71 (2d Cir.1982), *cert. denied sub nom. Coyne v. Kendrick*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983), and is found to be adequate here, where the well-publicized nature of the crisis in the silver futures market from which this action arose decreases the likelihood that a significant number of absent class members will fail to become aware of the pendency of this action.[20]

Defendants also argue that the alleged inadequacies in notice will increase the chance of collateral attack by absent class members after this action has been resolved. The risk of collateral attack seems remote. The degree of defendants' exposure to collateral attack depends not only on the number of class members now identified but also on the number of class members who file claims after notice through publication, and, as discussed above, it is concluded that this combination of individual notice and notice by publication is adequate and should be sufficient to notify the vast majority of class members in this much-publicized action. Although individual class members could have significant damage claims, it is particularly unlikely that those who suffered heavy losses will not be informed one way or another of the pendency of this action. Furthermore, as a legal matter successful collateral attack based on inadequate notice would be difficult after a determination of adequacy by this court based on a full record. *Cf. Grunin v. International House of Pancakes*, 513 F.2d 114, 121 (8th Cir.1975) (rejecting notice-based objections to class settlement even though one-third of class members were not reached by mailing and publication was not ordered).

The motion to decertify the *Gordon* class, or, in the alternative, to limit its scope, is denied.

It is so ordered.

---

**20.** Defendants' arguments for decertification due to unmanageability of the class and inadequacy of representation are similarly based on inadequacy of notice and are rejected for the reasons discussed above.