# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1711

_____

Stuart R. Day, On behalf of themselves and all others similarly situated; Robert Sweeten, On behalf of themselves and all others similarly situated; Deborah McElroy, On behalf of themselves and all others similarly situated; James White, On behalf of themselves and all others similarly situated; Laura White, On behalf of themselves and all others similarly situated; Carol Myers, On behalf of themselves and all others similarly situated; Ronald Baird, On behalf of themselves and all others similarly situated; Michael Hasler, On behalf of themselves and all others similarly situated; Gary Ivy, Jr., On behalf of themselves and all others similarly situated; Deborah Place, On behalf of themselves and all others similarly situated; Randall Peters, On behalf of themselves and all other similarly situated; Jonathan Chudy, On behalf of themselves and all other similarly situated; Norman Evans, Jr., On behalf of themselves and all other similarly situated; Paula Rogers, On behalf of themselves and all other similarly situated; Samuel Lister, On behalf of themselves and all other similarly situated; Corey Hall, On behalf of themselves and all other similarly situated; James Roachell, On behalf of themselves and all other similarly situated; Sonia Sexton, On behalf of themselves and all other similarly situated; Julie Daniels, On behalf of themselves and all other similarly situated; Lynda Tenny, On behalf of themselves and all others similary situated; Robert Williamson, On behalf of themselves and all others similarly situated; Kathleen Smith, On behalf of themselves and all others similarly situated; Connie DeNoon, On behalf of themselves and all others similarly situated; Kimberly Brown, On behalf of themselves and all others similarly situated; Leah Burton, On behalf of themselves and all others similarly situated; Barbara Pitts, On behalf of themselves and all others similarly situated; James Sanders, On behalf of themselves and all others similarly situated; Kelly Webb, On behalf of themselves and all others similarly situated; Jon Stark, On behalf of themselves and all others similarly situated; Kevin Mayes, On behalf of themselves and all others similarly situated; Sandra Luckey, On behalf of themselves and all others similarly situated; Tod Williams, On behalf of themselves and all others similarly situated; Karla Marina, On behalf of themselves and all others similarly situated; Tracey Hawkins, On behalf of themselves and all others similarly situated; James E. Browning, On behalf of themselves and all others similarly situated; James Browning, On behalf

of themselves and all others similarly situated; Andrew Shelton, On behalf of themselves and all others similarly situated; Michael Masters, On behalf of self and others similarly situated; John Pitts, On behalf of self and all others similarly situated; Keith Adcock, On behalf of self and all others similarly situated; Timothy Hodnett, On behalf of self and all others similarly situated; Ford Young, On behalf of self and all others similarly situated; Merinda Uitermarket, On behalf of self and all others similarly situated; Lindsey Powers, On behalf of self and all others similarly situated

*Plaintiffs - Appellees*

v.

Celadon Trucking Services, Inc.

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock
_____

Submitted: January 14, 2016
Filed: July 5, 2016
_____

Before MURPHY, SMITH, and BENTON, Circuit Judges.
_____

SMITH, Circuit Judge.

Appellees are a class of former employees ("the employees") of non-party Continental Express, Inc. ("Continental"). The employees brought a class action lawsuit against Celadon Trucking Services, Inc. ("Celadon"), alleging that Celadon violated the Worker Adjustment and Retraining Notification (WARN) Act. The

district court[1] certified the class under Federal Rule of Civil Procedure 23(b)(3), granted partial summary judgment in favor of the employees as to WARN Act liability, and awarded the employees damages due under the WARN Act. Celadon appeals the judgment of the district court, arguing that (1) it is not liable under the WARN Act, (2) the district court committed multiple errors on the class-certification issue, (3) the district court relied on inadmissible evidence in awarding damages to the employees, and (4) the district court erred in rejecting its good-faith defense under the WARN Act.

## I. *Background*

Continental, based in Little Rock, Arkansas, owned and operated a commercial trucking business that serviced customers throughout the United States. On December 4, 2008, Continental and Celadon entered into a written Asset Purchase Agreement (APA). In the opening recitals, the APA states that Celadon "desires to purchase certain assets and assume certain liabilities of [Continental], and [Continental] desires to sell such assets and assign such liabilities to [Celadon] upon the terms and conditions set forth in this Agreement." In addition to Continental's trucks and trailers, the APA lists the "Purchased Assets" as:

> Agreements, contracts, commitments, leases, plans, bids, quotations, proposals, instruments, computer programs and software, data bases whether in the form of computer tapes or otherwise, related object and source codes, manuals and guidebooks, price books and price lists, customer and subscriber lists, supplier lists, sales records, files, correspondences, legal opinions, rulings issued by governmental entities, and other documents, books, records, papers, files, office supplies, furniture and fixtures, company vehicles, yellow iron equipment, equipment, yard equipment, mechanic equipment, shop equipment and data belonging to [Continental].

---

[1]The Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas.

Celadon also purchased the right to "use the name 'Continental Express' and variants thereof." The APA specifically excluded certain assets from the sale, such as Continental's "cash and cash equivalents," "customer accounts receivables," "real estate," and "goodwill relating to the Business other than the Purchased Assets." The "Purchase Price" under the APA was $24.1 million.

Contemporaneous with the APA, and in accordance with section 5.7 of the APA, Continental's president and vice president executed a noncompetition agreement. The noncompetition agreement states that "Celadon has purchased the business and substantially all of the assets, including but not limited to the business name, customer business, customer lists, and driver lists, of [Continental] pursuant to the terms of [the APA.]" The noncompetition agreement further states that "Celadon intends to merge the operation of the business known as [Continental] into Celadon and [the Continental officer] is willing to enter into this Agreement as an inducement to Celadon to consummate the purchase of the business."

At the time of the sale, Continental had 658 employees. As part of the APA, Celadon agreed to deliver to Continental a list of driver- and nondriver-employees to whom Celadon intended to offer employment. With respect to driver-employees, Celadon agreed to offer employment to all of Continental's drivers, "except those [d]rivers that fail to meet [Celadon's] standard driver employment requirements." According to section 5.2(b) of the APA, "the [n]on-hired [d]rivers shall not be deemed to be employees of [Celadon] for any reason." After the sale, Celadon offered employment to 201 of Continental's 658 employees. The remaining employees were terminated between December 5 and December 17, 2008. As agreed to in the APA,

> [f]or a period of Fourteen (14) days immediately following the Closing Date, [Continental] shall (i) continue to employ the Non-Drivers not offered employment by [Celadon] that are listed on Schedule 5.6 and

required for the transition activities and (ii) use reasonable efforts to assist [Celadon] with transition of the Business from [Continental] to [Celadon].

Under section 1.3, *Excluded Liabilities*, Continental and Celadon agreed that Celadon would not "assume" or "be responsible for any liabilities or obligations of [Continental] . . . including, but not limited to, . . . liabilities under the [WARN] Act." In section 5.2, *Employees*, the parties agreed that "[Continental] shall send the notices required by the [WARN] Act and be responsible for any costs and expenses connected therewith." The terminated employees were not sent written notice of their employment termination as required by the WARN Act. *See* 29 U.S.C. § 2102(a).

On January 16, 2009, the employees filed a class-action complaint against Celadon, seeking damages under the WARN Act. Celadon notified Continental of the complaint and invoked the APA provisions that placed WARN Act responsibility on Continental. Continental agreed that "the contract clearly says [it] [is] responsible," and it undertook the defense on behalf of Celadon. Counsel for Continental advised Celadon that "the WARN complaint will come back to [Continental] and [the employees] will just be an unsecured creditor." Continental agreed to answer the complaint and move to dismiss "as [it] believe[d] Celadon not to be a proper defendant."

Pursuant to Federal Rule of Civil Procedure 23, the employees moved to certify the following class:

All individuals who were full-time employees of [Continental's] operations in Little Rock, Arkansas, who were employed on the date of the sale to Celadon (December 4, 2008) and suffered an employment loss as defined by the WARN Act, but did not receive the required 60 days notice of a plant closing/mass layoff.

-5-

The district court denied without prejudice the employees' motion to certify, citing the employees' failure to provide any actual evidence that a similarly situated class of individuals exists. The employees timely filed a renewed motion for class certification, supported with affidavits of former Continental employees and evidence produced by Celadon during discovery showing that approximately 449 individuals suffered an employment loss as a result of the sale. The district court then found that Rule 23's numerosity, commonality, typicality, and adequacy-of-representation requirements were satisfied. The district court addressed each of the factors set forth in Rule 23(b)(3) and found that class certification was appropriate under the rule.

The case proceeded through discovery, after which the employees and Celadon filed cross-motions for partial summary judgment on the issue of WARN Act liability. Based on undisputed evidence, the district court found that "Celadon purchased Continental's assets with the intent to run the business as a going concern" and granted the employees' motion for summary judgment on the issue of WARN Act liability. The district court left the issue of damages for later determination. Counsel for both parties "conferred" and "determined that the most economical and efficient method to address the damages portion of the class action would be through stipulations after a claims process." As a result, counsel for both parties requested that the trial on damages be continued to give them an opportunity to collaborate on a stipulated damages amount to submit to the district court. The district court continued the trial date and scheduled a teleconference for the purpose of developing a plan and a timeline for resolution of the remaining damages issues.

Before the scheduled teleconference, Celadon moved to substitute counsel. Continental had informed Celadon that "[Continental] is out of cash and will not be able to pay further funds to [counsel] to defend Celadon against the W[ARN] Act violation." Newly retained counsel for Celadon moved for interlocutory appeal and a stay of proceedings, arguing that the district court's order granting partial summary judgment "involves a controlling question of law as to which there is substantial

ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *See* 28 U.S.C. § 1292(b). The district court granted the motion. This court, upon review of the petition for appeal, denied it.

After remand, the employees moved for partial summary judgment on the issue of damages. In response, Celadon's new counsel moved to reopen discovery pursuant to Federal Rule of Civil Procedure 56(d). The district court denied Celadon's motion in part, explaining that "Celadon has never, until this late date, requested an extension or reopening of discovery." The district court also cited the parties' agreement to produce a stipulated damages amount as "weigh[ing] against reopening discovery at this late date." Nonetheless, the district court granted Celadon an additional 20 days to respond to the employees' motion for summary judgment.

Subsequently, Celadon filed a cross-motion for partial summary judgment on the issue of damages. It presented evidence that some individuals listed on the employees' damage spreadsheets were not aggrieved employees entitled to WARN Act damages. Celadon also raised a good-faith defense under the WARN Act as a basis to reduce its monetary liability. *See* 29 U.S.C. § 2104(a)(4).

The district court denied both parties' motions for partial summary judgment on damages "[b]ecause questions remain[ed] as to the specific individuals who qualify as aggrieved employees" entitled to WARN Act damages. As to the good-faith defense, the district court found that Celadon waived the defense by failing to plead it in its responsive pleading. Alternatively, the district court determined that even if Celadon were permitted to assert the good-faith defense, it failed to show entitlement to a reduction of damages under § 2104(a)(4).

In order to "develop an efficient, agreed procedure for a resolution of th[e] case," the district court convened a teleconference. No agreement could be reached.

The district court, therefore, referred the case to a magistrate judge "for necessary proceedings and proposed findings and recommended disposition on the following issue: Which individuals seeking damages in this case are properly included within the plaintiff class?"

The magistrate judge conducted an evidentiary hearing and considered whether the employees had established that each of the 449 individuals previously included in the class definition qualified as members of the plaintiff class. After the magistrate judge issued a report and recommendation of his findings, Celadon moved to decertify the class. In considering Celadon's motion, the district court "clarifie[d] that it did not intend that [the employees] prove, once again, that each individual listed on the class roster meets the class definition and qualifies as an 'aggrieved employee' under the WARN Act." The district court admitted that it "should have directed the magistrate judge to find which class members should be *excluded* from the class as opposed to which members should be *included*." It noted that the employees initially "presented evidence identifying 449 former Continental employees, who suffered an 'employment loss' . . . that occurred after Celadon purchased Continental." The district court explained that "Celadon failed to seasonably dispute [the employees'] evidence, and the [district] [c]ourt's summary judgment ruling on liability, which remains the law of this case, extends to each of the 449 individuals previously established as members of the class." Given the case's posture, the district court placed the burden on Celadon "to show that specific class members, identified by Celadon, should be excluded from the class." The district court did not find that its "failure to give proper direction in the referral order . . . alter[ed] the fact that [Celadon] failed to dispute liability as to the 449 aforementioned persons." According to the district court, Celadon was not "entitled to retry th[e] case from the beginning merely because it . . . retained new counsel."

Based on the magistrate judge's findings, the district court excluded 3 individuals from the 449 individuals previously included in the class. The district

court then set a date for the parties to submit "proposed findings of fact and conclusions of law concerning damages for the claims on which liability has been established."

In a pre-damages-hearing order, the district court determined that due to the unexplained absence of Continental's personnel or payroll records, the employees would not be subject to a strict, individualized claim process. Celadon produced none of Continental's personnel or payroll records to the employees. Celadon's original counsel placed a "'litigation hold' notice calculated to preserve any electronically stored information that could be relevant to this litigation." Unfortunately, the effort failed.

As to damages, the district court employed a burden-shifting procedure for the employees to prove their damages. The employees bore the initial burden to produce sufficient evidence, which the district court held could include representative evidence, to support a reasonable inference as to the extent of the employees' damages. If the employees made the initial showing, "Celadon w[ould] have the opportunity 'to come forward with evidence . . . to negative the reasonableness of the inference.'" (Quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946), *superseded by statute on other grounds*, Portal–to–Portal Act of 1947, Pub. L. No. 80–49, 61 Stat. 84.)

At the damages hearing, the district court permitted the employees to establish their claims for back pay and benefits through various means, including pay records retained by a portion of the employees, reports summarizing the final benefits of Continental employees, and the affidavits of four of the employees. Additionally, the employees were permitted to present spreadsheets showing the salaries, rates of pay, and benefits for each employee. Timothy Hodnett, a member of the class and an employee who had served as Continental's vice president of human resources, testified that the spreadsheet data was based on employee tax forms, pay stubs, and other

documents that he had reviewed. Relying on this evidence, the district court awarded the employees statutory damages in the amounts set forth in the spreadsheets attached to its final judgment. Six years separated the filing of the employees' complaint from the district court's order on damages.

## II. *Discussion*

Celadon appeals the judgment of the district court, arguing that (1) it is not liable under the WARN Act, (2) the district court committed multiple errors on the class-certification issue, (3) the district court relied on inadmissible evidence in awarding damages to the employees, and (4) the district court erred in rejecting its good-faith defense under the WARN Act.

## A. *WARN Act Liability*

Celadon argues that it did not have a duty to give the employees WARN Act notice because it did not purchase Continental as a going concern. Celadon contends that the sale was merely a sale of assets. According to Celadon, "Celadon and Continental intentionally structured the transaction in this case as a purchase of assets" and "buyers and sellers know when a transaction is intended as a mere asset purchase as opposed to the transfer of a going concern and can determine who must give the WARN Act notice." Celadon also argues that the sale-of-business exclusion in the WARN Act cannot be used to create affirmative WARN Act liability on a purchaser. Even if the sale-of-business exclusion applies, Celadon contends that it rebutted the presumption created by the exclusion. We review de novo the district court's grant of partial summary judgment on the issue of WARN Act liability. *See Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1280 (8th Cir. 1996).

Under the WARN Act, "[a]n employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such

an order" to "the affected employees" and "the State." 29 U.S.C. § 2102(a).[2] This notice is meant to "provide[] workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1(a). If an employer violates the notice requirements in 29 U.S.C. § 2102, the employer is liable to employees suffering an "employment loss" for specified damages as set forth in § 2104. An "employment loss" is defined as "(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each

---

[2]The WARN Act defines "plant closing" as "the permanent or temporary shutdown of a single site of employment . . . if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees." 29 U.S.C. § 2101(a)(2). A "mass layoff" is defined as

a reduction in force which—

(A) is not the result of a plant closing; and

(B) results in an employment loss at the single site of employment during any 30-day period for—

(i)(I) at least 33 percent of the employees (excluding any part-time employees); and

(II) at least 50 employees (excluding any part-time employees); or

(ii) at least 500 employees (excluding any part-time employees) . . . .

29 U.S.C. § 2101(a)(3). The parties do not dispute that there was a "mass layoff" as defined by the WARN Act.

month of any 6-month period." 29 U.S.C. § 2101(a)(6). Relevant to this case, the WARN Act provides the following exception to the definition of "employment loss":

> In the case of a sale of part or all of an employer's business, the seller shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title, up to and including the effective date of the sale. *After the effective date of the sale of part or all of an employer's business*, the purchaser shall be responsible for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title. Notwithstanding any other provision of this chapter, any person who is an employee of the seller (other than a part-time employee) as of the effective date of the sale shall be considered an employee of the purchaser immediately after the effective date of the sale.

29 U.S.C. § 2101(b)(1) (emphasis added).

The WARN Act leaves "sale of business" undefined for purposes of 29 U.S.C. § 2101(b)(1). In applying § 2101(b)(1), we distinguish between sales of assets and sales of businesses as a going concern. *See, e.g.*, *Wilson v. Airtherm Prods., Inc.*, 436 F.3d 906, 910 (8th Cir. 2006); *Smullin v. Mity Enters., Inc.*, 420 F.3d 836, 839 (8th Cir. 2005); *Burnsides v. MJ Optical, Inc.*, 128 F.3d 700, 702 (8th Cir. 1997). "[W]hen a case involves simply a sale of assets, as opposed to the sale of a business as a going concern, the seller retains the WARN Act notice requirement because the seller is the party actually closing the plant that results in employment losses." *Wilson*, 436 F.3d at 910 (citations omitted). On the other hand, "[w]hen the sale of a business as a going concern is involved, the sale-of-business exclusion creates a presumption that the buyer is the employer for WARN Act purposes if the seller still employs its employees on the day of the sale." *Id.* at 911.

Celadon's liability turns on whether the APA constituted a sale of assets or a sale of a business as a going concern.[3] Although Celadon and Continental styled the sale as a sale of assets by entering into an "asset purchase agreement," its terms bind only its signatories. Based on our review, we consider this transaction as a "sale of part or all of [Continental's] business." *See* 29 U.S.C. § 2101(b)(1). Congress passed the WARN Act to protect employees; it is not a technical labyrinth that sophisticated corporate lawyers can navigate to the disadvantage of employees. Congress did not draft § 2101(b)(1) in the tongue of "the tax-oriented world of corporate lawyers and investment bankers." *Smullin*, 420 F.3d at 839 (noting that Congress avoided terms "such as 'merger,' 'sale of stock,' 'sale of assets,' and so forth"). Rather Congress took a common-sense approach and "used a more generic term, 'sale of a business,' which clearly connotes *any* transaction that transfers all or part of the employer's overall operations *as a going concern*." *Id.*

Viewing the Celadon–Continental transaction in light of this common-sense approach, we agree with the district court that the transaction was more than merely a sale of assets. Black's Law Dictionary defines "going concern" as "[a] commercial enterprise actively engaging in business with the expectation of indefinite continuance." *Going Concern*, Black's Law Dictionary (10th ed. 2014). The APA reflects that Celadon purchased Continental intending to continue Continental's existing trucking business indefinitely. Celadon purchased all of the instruments that were central to Continental's business. For example, Celadon purchased Continental's name, customer and subscriber lists, agreements, contracts, commitments, plans, bids,

---

[3]Celadon and Continental attempted to allocate WARN Act notice responsibility by contract. Regardless of its binding effect as between Celadon and Continental, the protections that the WARN Act affords employees are not determined by contract. *See Wilson,* 436 F.3d at 912 n.4 (holding that the contractual structure of a sale "does not answer the questions of whether there is a plant closing for purposes of the WARN Act or who has notification responsibility if a plant closing occurs").

and quotations. As set forth in sections 3.7, 3.8, 3.9, 7.1(g), and 7.1(j), the APA required Continental to ensure and maintain the viability of its business, especially with respect to its five largest customers.

The noncompetition agreements that the APA required Continental's president and vice president to execute further evidence the nature of the transaction. The agreements state that "Celadon has purchased the business and substantially all of the assets, including but not limited to the business name, customer business, customer lists, and driver lists, of [Continental] pursuant to the terms of [the APA.]" Most tellingly, the noncompetition agreements state that "Celadon intends to merge the operation of the business known as [Continental] into Celadon and [the Continental officer] is willing to enter into this Agreement as an inducement to Celadon to consummate the purchase of the business." The APA itself obligated Continental to "use reasonable efforts to assist [Celadon] with the transition of *the Business* from [Continental] to [Celadon]." (Emphasis added.) Celadon's interest included much more than the maintenance of "Continental's trucks and trailers"—it included Continental's active business.

Celadon asks us to hold that this transaction was not the sale of a business as a going concern because the sale lacks what Celadon terms "hallmarks" of such sales. These hallmarks include (1) the automatic transfer of the seller's employees to the purchaser and (2) the purchase of the seller's accounts receivable. Celadon relies on our ruling in *Burnsides* for support. Yet, Celadon's reliance is misplaced, as *Burnsides* provides no support for Celadon's preferred disposition.

In *Burnsides*, the buyer initially agreed to purchase most of the seller's assets and to "take over operations" at the seller's plant for up to 45 days. 128 F.3d at 701. But on closer inspection, the buyer decided that it would not take over operations and instead purchased and removed from the plant the seller's tools and equipment. *Id.* On the day of the sale, the seller informed its employees of the sale, closed the plant, and

-14-

encouraged its employees to apply for employment with the buyer. *Id.* at 702. The employees brought a WARN Act claim against the buyer, arguing that the buyer was responsible for the employment loss and required to give WARN Act notice. *Id.* Although the court in *Burnsides* expressed doubt that the transaction constituted a sale of a business under § 2101(b)(1), it held that even under § 2101(b)(1), "responsibility for giving notice never passed to [the buyer] because the [employment loss] occurred on the sale's effective date." *Id.* In explaining why notice did not pass to the buyer, the court in *Burnsides* pointed out that the buyer "did not automatically hire [the seller's] employees . . . or take on any of [the seller's] receivables or liabilities." *Id.* at 703.

In *Burnsides*, the court referred to the automatic hiring of the seller's employees and the seller's accounts receivable but not for determining the nature of the transaction. By contrast, Celadon's argument treats this reference as part of the court's classification of the transaction. The court had already determined that it was doubtful that the transaction was for the sale of a business. Instead, the reference was made when the court assumed, for the sake of argument, that the transaction was for the sale of a business. Moreover, the statute does not require the purchaser to actually hire the seller's employees. The WARN Act deems a seller's employee to be a purchaser's employee immediately after the effective date of the sale of a business. *See* 29 U.S.C. § 2101(b)(1) ("Notwithstanding any other provision of this chapter, any person who is an employee of the seller (other than a part-time employee) as of the effective date of the sale shall be *considered* an employee of the purchaser immediately after the effective date of the sale." (emphasis added)). In this case, the district court correctly found that the transaction between Continental and Celadon constituted a sale of Continental's business as a going concern.[4] Thus, if the employment loss occurred

[4]Even though we do not limit sales of businesses as a going concern to only those transactions that involve the automatic hiring of a seller's employees, we note that the APA does obligate Celadon to hire certain Continental employees. In section 5.2(a), the APA states that Celadon "shall . . . offer employment . . . to all Drivers on the Driver List, except those Drivers that fail to meet [Celadon's] standard driver

-15-

"[a]fter the effective date of the sale of part or all of an employer's business, the purchaser shall be responsible for providing notice." *See* 29 U.S.C. § 2101(b)(1). Here, the employees were terminated after December 4, 2008. Consequently, responsibility to provide notice passed from Continental to Celadon.

Celadon next argues that § 2101(b)(1) cannot be used to impose WARN Act liability on a purchaser. This argument is refuted by the plain language of § 2101(b)(1). "After the effective date of the sale of part or all of an employer's business, the purchaser *shall be responsible* for providing notice for any plant closing or mass layoff in accordance with section 2102 of this title." 29 U.S.C. § 2101(b)(1) (emphasis added). Section 2101(b)(1) was added to the WARN Act "to clarify that when employees are transferred from seller to buyer as part of a sale, employees have not suffered an employment loss." *Burnsides*, 128 F.3d at 702. In other words, a sale alone does not constitute an "employment loss" but instead serves as a pivot point for notice responsibility. *See Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1280 (10th Cir. 1994) (explaining that under § 2101(b)(1), "the obligation to warn employees in the event of a closure or mass layoff skips from seller to buyer, never triggered by the sale"). "Affected employees are always entitled to notice" under the WARN Act. *See* 20 C.F.R. § 639.4(c). "The essential question is whether the seller or the buyer is considered the employer for WARN Act purposes." *Wilson*, 436 F.3d at 911. The WARN Act imposes affirmative WARN Act liability on purchasers that are considered employers of employees when an employment loss occurs.

Even if the sale-of-business exclusion applies to purchasers, Celadon contends that the exclusion only creates a presumption of employment. Celadon argues that the APA and specifics of the sale rebut this presumption. In *Wilson*, we said that "it is presumed that a sale of a business as a going concern involves the hiring of the seller's employees unless something indicates otherwise." *Id.* at 912. We elaborated,

employment requirements."

instructing that "[f]ocusing on whether the seller terminated its employees' employment is not the proper focus when analyzing potential WARN Act violations involving the sale of a business as a going concern." *Id.* Rather, the WARN Act's focus is on "who actually effects the [employment loss]." *Id.*; *see also* 20 C.F.R. § 639.6 ("Although a technical termination of the seller's employees may be deemed to have occurred when a sale becomes effective, WARN notice is only required where the employees, in fact, experience a covered employment loss.").

Continental sold its trucking business as a going concern to Celadon. Nothing in the APA alters that fact. Indeed, the APA clarifies the matter. The APA required Continental's employees to remain employed for 14 days following the date of the sale. Under the WARN Act, these employees are considered employees of Celadon. *See Wilson*, 436 F.3d at 909–10 (holding that "[a]s long as the seller's employees are employed by the seller on the effective date of the sale, those employees automatically are considered to be employees of the buyer immediately after the effective date of the sale for purposes of the WARN Act" (quotation and citation omitted)). Those employees who were not offered employment by Celadon at the expiration of this 14-day period suffered an employment loss. Celadon, as the statutory employer, not Continental, caused the employment loss. *See id.* at 911 (noting that "the sale of a business as a going concern typically will not involve a qualified plant closing with resultant employment loss unless and until the buyer makes such a decision" (footnote omitted)).

## B. *Class Certification*

On the issue of class certification, Celadon makes three arguments. First, it argues that the district court erred by placing the burden on Celadon to prove which members of the class should be excluded. Second, it argues that the district court abused its discretion when it denied Celadon's motion to decertify. Third, it argues that the district court further abused its discretion by rejecting many of the magistrate judge's findings. We accord the district court "broad discretion to decide whether

-17-

certification is appropriate, and we will reverse only for abuse of that discretion." *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013) (quotation and citation omitted).

### 1. *Burden*

In ruling on its motion to decertify, Celadon argues that the district court improperly required it to bear the burden of proof. To achieve certification as a class, plaintiffs must meet Rule 23's requirements of numerosity, commonality, typicality, and fair and adequate representation. Fed. R. Civ. P. 23(a). A plaintiff bears the initial burden of showing that the class should be certified under Rule 23. *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994). "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (footnote omitted); *see also* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). "A district court has a duty to assure that a class once certified continues to be certifiable under Fed. R. Civ. P. 23(a)." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1145 (8th Cir. 1999) (citation omitted).

Our circuit has yet to address which party bears the burden on a motion to decertify a class.[5] Before answering this question, we begin by reviewing the

---

[5]In fact, scant appellate authority exists on the question. The Ninth Circuit held that, "as to the class-decertification issue, Marlo, as '[t]he party seeking class certification [,] bears the burden of demonstrating that the requirements of Rules 23(a) and (b) are met." *Marlo v. UPS, Inc.*, 639 F.3d 942, 947 (9th Cir. 2011) (alterations in original) (citation omitted). Suggesting otherwise, the Fifth Circuit touched on this question in dicta buried in a footnote. *See Baldridge v. SBC Commc'ns, Inc.*, 404 F.3d 930, 932 n.3 (5th Cir. 2005) ("Although the defendants may be correct in noting that the burden of persuasion shifts from plaintiffs (to show the merits of certification) to defendants (to show the merits of decertification), the difference is irrelevant."). Certain district courts have placed a "'heavy burden'" on defendants moving for decertification or even moving to limit the scope of a class. *Hammer v. JP's Sw.*

circumstances of this case. At the outset, the district court properly placed the burden on the employees to show that the class should be certified. Upon its initial consideration of the issue, the district court denied the employees' motion to certify the class because they "provid[ed] no actual evidence showing the existence of a class of individuals who share their grievances." The employees renewed their motion to certify the class, and "after rigorous analysis," the district court found that the employees demonstrated "each of the prerequisites for certification ha[d] been satisfied." The district court thus concluded that the employees met their burden to prove class status. The employees then moved to notify the class. Celadon raised objections to how the employees intended to notify potential class members, and it also requested "an opportunity to object to specific individuals being sent notice on the ground that they are not within the class definition." After the employees addressed Celadon's objections at the direction of the district court, Celadon did not renew its objections. Once notices were approved and sent out to potential class members, the district court granted partial summary judgment on WARN Act liability in favor of the *class* of employees. Before a hearing could be held on damages, the district court referred the case to the magistrate judge to determine which members should be *included* within the class. The court later clarified that it meant for the magistrate judge to determine which members should be *excluded* from the class. Although the district court's instructions to the magistrate judge were unclear, the class was never decertified. Years after the class was certified, Celadon moved to decertify the class. The district court, in considering Celadon's motion, determined

*Foods, L.L.C.*, No. 08-0339-CV-W-FJG, 2011 WL 183972, at *2 (W.D. Mo. Jan. 19, 2011) (quoting *Gonzales v. Arrow Fin. Servs. LLC*, 489 F. Supp. 2d 1140, 1154 (S.D. Cal. 2007); citing *Gordon v. Hunt*, 117 F.R.D. 58, 61 (S.D.N.Y. 1987)). *But see Stepp v. Monsanto Research Corp.*, No. 3:91CV468, 2012 WL 604328, at *3 & n.3 (S.D. Ohio Feb. 24, 2012) (reversing its earlier holding that defendant had the burden to prove decertification and concluding the plaintiffs retain the burden of establishing class requirements in order to survive a motion for decertification); *D.G. ex rel. Strickland v. Yarbrough*, 278 F.R.D. 635, 637 (N.D. Okla. 2011) (noting the plaintiff acknowledged it retained the burden).

-19-

that "[a]t this juncture, Celadon has the burden to show that specific class members, identified by Celadon, should be excluded from the class." After study, the district court held that Celadon did not meet its burden and denied its motion to decertify the class.

On this record, the district court did not abuse its discretion. This record presents a narrow issue: whether the district court erred in requiring Celadon to bear the burden of establishing that certain members of the certified class should be excluded. Generally, the proponent of a motion bears the initial burden of showing that the motion should be granted.[6] Additionally, a district court maintains an independent duty to assure that a class continues to be certifiable under Rule 23(a). *See Petrovic*, 200 F.3d at 1145. The existence of this independent obligation lends further support for requiring the movant to bear the burden of showing that the district court mistakenly maintained class certification. Moreover, a defendant bears a more onerous burden in challenging certification where, as here, the initial certification decision was carefully considered and made after certification-related discovery.[7] The "law of the case" doctrine is also relevant. Although it is not an absolute bar to modification of a certification order, *see* Fed. R. Civ. P. 23(c)(1)(C), its policy

---

[6]*See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (holding that party moving for summary judgment always bears the initial burden of demonstrating the basis for its motion); *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 662 (1978) (holding that party moving for issuance of a writ of mandamus has the burden of showing its right to issuance of the writ); *Am. Prairie Constr. Co. v. Hoich*, 560 F.3d 780, 790 (8th Cir. 2009) (holding that movant seeking judicial disqualification bears a "substantial burden"); *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (holding that movant seeking a preliminary injunction has a heavy burden); *White v. Nix*, 43 F.3d 374, 376 (8th Cir. 1994) (movant for certification of interlocutory appeal bears a heavy burden).

[7]In 2003, Congress amended Rule 23 to prohibit "conditional" certification. Certification orders must undergo "rigorous analysis," *see Elizabeth M. v. Montenez*, 458 F.3d 779, 784 (8th Cir. 2006), and now have a more tested quality to them.

-20-

principles apply. *Cf.* 3 William B. Rubenstein, *Newberg on Class Actions* § 7:39 (5th ed. 2013) (noting that if a defendant can require a court to revisit certification decisions without any showing whatsoever and place the onus on the plaintiff to once again prove certification, "its incentives will be skewed"). Here, the district court certified the class, ordered that notices be sent out to potential class members,[8] and granted partial summary judgment in favor of the class. "[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (quotation and citation omitted). Celadon had a full and fair opportunity to contest class certification. In approving the notice to potential class members, the district court noted that the employees addressed the objections that Celadon raised and Celadon did not file any additional objections. After receiving the attention and consideration of the district court on this issue, principles of fair adjudication require Celadon to provide good reason before the district court revisits the issue. We are satisfied that the district considered the reasons tendered and found them wanting.[9]

## 2. *Motion to Decertify*

Celadon also argues that the district court abused its discretion by denying its motion to decertify the class. According to Celadon, individualized damage questions predominate and warrant decertification. Celadon does not challenge that the prerequisites for a class action listed in Rule 23(a) are satisfied.

---

[8]In *Falcon*, the Supreme Court held that a "judge remains free to modify [a certification order] in the light of subsequent developments in the litigation." *Falcon*, 457 U.S. at 160 (footnote omitted). The Court noted that this is "particularly" true "*before any notice is sent* to members of the class." *Id.* (emphasis added). Plainly, once notice is sent, a judge should approach modification more tentatively.

[9]We do not hold that a defendant will in all circumstances bear the burden to show which members should be excluded from a certified class. Our holding is no broader than the instant facts.

Certification of a Rule 23(b)(3) class requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). To guide the inquiry, the rule sets forth four factors to consider:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing the class action.

*Id*. We have explained that "[t]he predominance inquiry requires an analysis of whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member." *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013) (citing *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010)). The rule "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (citation and footnote omitted). When there are issues common to the class that predominate, "the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, *such as damages* or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (emphasis added) (quotation and citation omitted).

The district court did not abuse its discretion in certifying the class under Rule 23(b)(3) nor in refusing to decertify the class. The WARN Act contemplates class-

action adjudication. *See* 29 U.S.C. § 2104(a)(5) ("A person seeking to enforce such liability . . . may sue either for such person *or for other persons similarly situated*, or both, in any district court of the United States . . . ." (emphasis added)). Celadon is simply mistaken that individual damage questions predominate over questions common to the class. Celadon cites *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), to support its contention. Unlike the plaintiffs in *Comcast*, where the plaintiffs' damages model was inconsistent with the plaintiffs' liability case, *see id.* at 1433, the damages model in this case is consistent with the employees' liability case. The *Comcast* model did not tie liability to the damages the plaintiffs were demanding. *Id.* Here, liability and damages intertwine. The WARN Act sets the damages for which a violating employer is liable. *See* 29 U.S.C. § 2104(a)(1). Celadon is liable to all employees that suffered an "employment loss" as a result of Celadon's "mass layoff." Certainly, there are individualized inquiries for determining the rate of compensation for each employee.[10] But this is true of any WARN Act claim, and Celadon does not suggest that class actions are never appropriate for WARN Act violations.

Celadon further argues that certification is inappropriate based on evidence that it presented that certain members of the class did not meet the class definition. The failure of some plaintiffs to meet the class definition does not, by itself, require decertification of an entire class. Instead, Celadon's recourse was to contest individuals' class-membership status, just as it did before the district court. To the extent Celadon argues that its liability varies from member to member, we disagree. Once again, Celadon is liable to all employees that suffered an "employment loss." We do not dispute that each member must make some threshold showing of employment, but the showing is straightforward and minimal given § 2101(b)(1)'s presumption of employment. Moreover, the driver and nondriver lists that Celadon made pursuant to

---

[10]Any difficulty in calculating the rate of compensation for the employees likely stems from the missing personnel and payroll records that were purchased by Celadon and were available to Celadon after the sale.

the APA greatly simplified the district court's determination of aggrieved employees. The district court did not abuse its discretion in certifying this class of employees.

### 3. *Magistrate Judge's Findings*

Finally, Celadon contends that the district court erred by not adopting the magistrate judge's report and recommendation regarding class membership. As discussed *supra*, Part II.B.1, the burden was on Celadon to prove which members of the class should be excluded. Because the magistrate judge based his class analysis and decision on a different basis than the district court, the district court did not err in adopting the magistrate judge's findings only in part. Despite the confusion, the district court noted that the magistrate judge's factual findings assisted its decision.

### C. *Damages*

Celadon next argues that the district court abused its discretion by shifting the burden to prove damages from the employees to Celadon. Celadon contends that the district court erroneously invoked the *Mt. Clemens* burden-shifting analysis. Celadon also argues that the district court relied on inadmissible evidence at the damages hearing. "A district court's findings regarding damages are reviewed for clear error." *Stephenson v. El-Batrawi*, 524 F.3d 907, 916 (8th Cir. 2008) (citation omitted). "Rulings on admissibility of evidence will not be reversed absent a clear and prejudicial abuse of discretion." *Pittman v. Frazer*, 129 F.3d 983, 989 (8th Cir. 1997) (citation omitted). We will reverse a district court's evidentiary ruling only if it was based on "an erroneous view of the law or a clearly erroneous assessment of the evidence and affirmance would result in fundamental unfairness." *Wegener v. Johnson*, 527 F.3d 687, 690 (8th Cir. 2008) (quotations and citation omitted).

Relying on *Mt. Clemens*, the district court employed a burden-shifting procedure for the employees to prove damages. The district court found that this was necessary due to the unexplained absence of certain records. The employees retained the initial burden to produce sufficient evidence, which the district court held could

include representative evidence, to support a reasonable inference as to the extent of the employees' damages. If the employees made the initial showing, Celadon would have the opportunity to produce evidence to rebut the inference as to damages.

In proving damages, a difficult problem arises "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes." *Mt. Clemens*, 328 U.S. at 687. The problem, though, is not solved by "penaliz[ing] the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work." *Id*. Provided the fact of damage is certain, and "[t]he uncertainty lies only in the amount of damages," damages will not be precluded by the rule that disallows recovery of "uncertain and speculative" damages. *Id.* at 688. "That rule applies only to situations where the fact of damage is itself uncertain." *Id.*

Celadon contends that *Mt. Clemens* does not apply because the WARN Act does not contain any record-keeping obligations. Celadon is correct that *Mt. Clemens* involved a Fair Labor Standards Act (FLSA) regulation requiring an employer to maintain employment records. The principles undergirding the *Mt. Clemens* holding, however, do not hinge on the statutory record-keeping obligation. The Court in *Mt. Clemens* found that the general rule precluding recovery of uncertain or speculative damages does not apply where the fact of damages is certain. *Id.* Equity undergirds this burden-shifting rule. It would be unfair to "allow the employer to keep the benefits of an employee's labors without paying due compensation [as required under law]." *Id.* at 687. The Court also found that "[t]he remedial nature of [the FLSA] and the great public policy which it embodies," weighed against making the burden to prove damages as certain an impossible hurdle for the employee. *Id.* That scenario is present here. The WARN Act is a remedial statute stating the public policy of the United States to protect employees against certain employment losses. As the district

court recognized, without the personnel and payroll records, the employees would be unable to prove damages with certainty.[11]

Having concluded that the district court did not abuse its discretion by shifting the burden to Celadon after the employees made their initial showing, we turn to Celadon's claim that the district court relied on inadmissible evidence. The district court permitted the employees to submit representative evidence. The Supreme Court has recently disavowed a "categorical exclusion" of representative evidence. *Tyson Foods*, 136 S. Ct. at 1046. "Its permissibility turns . . . on the degree to which the evidence is reliable." *Id.* Celadon had the opportunity "to negative the reasonableness of any inferences to be drawn from the employee[s'] evidence." *See Mt. Clemens*, 328 U.S. at 688. Celadon did not negative the reasonableness of the evidence the district court relied on. Even before us, Celadon attacks the evidence's demonstrative nature. After thoroughly reviewing the evidentiary rulings of the district court in light of the burden-shifting framework it employed, we hold that the district court did not commit a clear and prejudicial abuse of discretion. *See Pittman*, 129 F.3d at 989.

---

[11]We note that we have used burden-shifting in other contexts. For example, in *Martin v. Feilen*, we held that "once the ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case of loss to the plan or ill-gotten profit to the fiduciary, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the breach of duty." 965 F.2d 660, 671 (8th Cir. 1992) (citation omitted).

D. *Good-Faith Defense*

Celadon last argues both that it preserved the good-faith defense by contesting WARN Act liability in its responsive pleadings and that its interpretation of law was objectively reasonable. Celadon argues that the district court abused its discretion in not reducing its damages or penalty under the WARN Act. As directed by the WARN Act, we review the district court's decision not to reduce damages under an abuse of discretion standard. *See* 29 U.S.C. § 2104(a)(4).

The WARN Act permits a court to reduce an employer's liability if it "proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter." 29 U.S.C. § 2104(a)(4). An employer bears the burden to demonstrate that it had a subjective intent to comply with the WARN Act and that its conduct was objectively reasonable. *See Castro v. Chicago Hous. Auth.*, 360 F.3d 721, 730 (7th Cir. 2004).

After damages were determined, Celadon sought to reduce its damages under § 2104(a)(4). The district court held that Celadon waived the defense by failing to assert facts that supported its defense under § 2104(a)(4). Alternatively, the district court found that even if Celadon had not waived the defense, it did not show that it was entitled to a reduction of damages under § 2104(a)(4). Because we agree with the district court's alternative holding, we need not address the issue of waiver. As a remedial statute, an exemption from the WARN Act must be construed narrowly. *See A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (holding that exemptions from remedial legislation must be narrowly construed); *see also Castro*, 360 F.3d at 730 (holding that the WARN Act's good-faith defense must be construed narrowly). Even if we assume that Celadon had a subjective intent to comply with the WARN Act, Celadon has not demonstrated that it had a reasonable basis for believing that it was not responsible for giving WARN Act notice. As discussed *supra*, Part II.A, the WARN Act clearly allocated notice responsibility to Celadon. Celadon has not shown

that it is entitled to a reduction of damages under § 2104(a)(4). The district court did not abuse its discretion in refusing to reduce Celadon's liability.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court

_____