SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**Regina Little v. Kia Motors America, Inc.** (A-24-18) (081691)

**Argued October 8, 2019 – Decided June 25, 2020**

**PATTERSON, J., writing for the Court.**

In this class action, plaintiff Regina Little asserted claims on her own behalf and on behalf of other New Jersey owners and lessees of 1997, 1998, 1999, and 2000 Kia Sephia vehicles distributed by defendant Kia Motors America, Inc., alleging that those vehicles had a defective brake system. The central question in this appeal is whether the trial court properly permitted plaintiff's theory of damages based on the cost of brake repairs to be asserted classwide, supported only by aggregate proofs.

Plaintiff filed this action against defendant in June 2001, asserting breach of warranty and statutory claims on her own behalf and on behalf of the putative class. In 2006, the class represented by plaintiff was defined as "[a]ll residents of the State of New Jersey who purchased or leased a model year 1995-2000 Kia Sephia within the six year period preceding the filing of the Complaint," subject to certain enumerated exclusions. The matter was tried before a jury in a four-week trial.

Plaintiff asserted two distinct theories of damages. First, she alleged that the defective brakes hastened each Kia Sephia's depreciation, diminishing the vehicle's value, and that all class members had thus overpaid for their vehicles. Second, plaintiff asserted that the class members incurred out-of-pocket costs due to the brake defect because the cars required more frequent brake repairs than they would have required absent the defect.

Plaintiff premised the latter claim not on individualized proof of class members' repair costs, but on an estimate by her expert, Raymond Scott King, that an average Kia Sephia owner would pay $1250 for brake repairs over the vehicle's life as a result of the defect alleged. On cross-examination, King made a number of concessions, including that he did not have any data on what Kia Sephia owners actually paid for relevant repairs.

The jury determined that defendant had breached its express and implied warranties and that the class had sustained damages. The jury found that the class members had suffered $0 in damages due to diminution in value but that each class

1

member had sustained $750 in damages "[f]or repair expenses reasonably incurred as a result of the defendant's breach of warranty."

In post-verdict proceedings, defendant moved for a new trial and for an order decertifying the class on the issue of damages. The court left the jury's liability verdict undisturbed but granted in part defendant's motion for a new trial, limited to the issue of damages. The court concluded that it had erred when it submitted the question of out-of-pocket repair costs to the jury and instructed the jury to consider plaintiff's second damages theory based on classwide proofs. Instead, the court determined that it should have required individualized proof of damages for the class members' brake repairs. The trial court therefore granted defendant's motion to decertify the class as to the quantum of damages each individual owner suffered.

A court-appointed Special Master conducted a claims process, evaluated the class members' individual claims, and recommended to the trial court that it award damages in the amount of $46,197.03 for the cost of repairs. The trial court accepted that recommendation, and, in 2015, final judgment was entered in plaintiff's favor in that amount plus attorneys' fees and costs.

The parties cross-appealed. The Appellate Division reversed the trial court's post-trial determinations, reinstated the jury's award for out-of-pocket repair costs based on plaintiff's aggregate proofs, and remanded for an award of attorneys' fees. 455 N.J. Super. 411, 416-36 (App. Div. 2018). The appellate court held that, notwithstanding the jury's rejection of plaintiff's diminution-in-value theory, the trial court should have ordered a new trial on both theories of damages, which it found were not "fairly separable from each another." See id. at 426.

The Court granted defendant's petition for certification, "limited to the issue of damages." 236 N.J. 113 (2018).

**HELD:** Although aggregate proof of damages can be appropriate in some settings, the Court considers such proof improper as presented in this case. The trial court erred when it initially allowed plaintiff to prove class-members' out-of-pocket costs for brake repairs based on an estimate untethered to the experience of plaintiff's class. The trial court properly ordered individualized proof of damages on plaintiff's brake-repair claim based on the actual costs incurred by the class members. Thus, the trial court's grant of defendant's motions for a new trial and for partial decertification of the class were a proper exercise of its discretion.

1. A class action does not dispense with traditional burdens of proof in the name of efficiency; to the contrary, it leaves the parties' legal rights and duties intact and the rules of decision unchanged. Before admitting aggregate proof of damages in a class action, a court must undertake a careful inquiry to ensure that the proposed evidence

2

does not deprive the defendant of a meaningful opportunity to contest the plaintiff's claims. In <u>Muise v. GPU, Inc.</u>, 371 N.J. Super. 13 (App. Div. 2004), the Appellate Division undertook precisely such an inquiry and set forth principles regarding aggregate proofs of damages, which the Court now adopts. (pp. 25-30)

2. To decide whether to permit classwide proof of damages, a court must carefully consider (1) the underlying cause of action for which the class seeks recovery; (2) the measure of damages that the law allows if there is a finding of liability for that claim; and (3) the methodology by which the plaintiff seeks to prove damages on an aggregate basis. If the plaintiff cannot establish a basis for a presumption that all members of the class have sustained damage, aggregate proof of damages raises the specter that an individual with no viable claim will recover a windfall. In such settings, the court should require individualized proof of damage. Even if the plaintiff can show that all class members have sustained damage, moreover, aggregate proof of damages must be based on a reliable mathematical formula in order to be admissible. (pp. 30-31)

3. The Court rejects any attempt to redefine the break-repair claim as an alternative measure of the diminution-in-value claim that does not require individualized proof. The Court reviews the actual claim that plaintiff presented and the court submitted to the jury -- a claim for the class members' out-of-pocket expenditures for brake repairs, presented through the testimony of her expert. The trial court properly recognized that plaintiff could pursue damages based on class members' out-of-pocket damages for costs of repair as a remedy for breach of warranty, distinct from her diminution in value claim. The Court therefore applies the principles set forth in <u>Muise</u> and other case law to the out-of-pocket repair cost claim that plaintiff presented at trial. (pp. 31-34)

4. Plaintiff presented no basis for a presumption -- much less for a conclusion -- that all members of the class suffered damages for out-of-pocket brake repairs necessitated by the Kia Sephia's brake defect. The uncertainty about class members' damages claims derived from the expansive definition of plaintiff's class, which included an undetermined number of members who stood to gain a windfall by virtue of the jury's award of $750 per class member for brake repairs. Even if plaintiff could demonstrate that all members of the class sustained an out-of-pocket loss, plaintiff's expert had no basis to develop a reliable mathematical formula for estimating the average out-of-pocket costs incurred by members of that class, and he did not present such a formula. This case is not a setting in which class members' claims for damages could fairly be premised on aggregate proofs. The trial court properly granted defendant's motion for a new trial limited to that aspect of plaintiff's damages claim. (pp. 34-39)

3

5.  The trial court also properly reassessed the question of predominance under Rule 4:32-1(b)(3) in holding that for purposes of the new trial on class members' out-of-pocket costs, common questions no longer predominated over individualized inquiries as to the class members' damages.  The trial court conducted a careful assessment of the common and individual questions.  It concluded that the class's damage claims could not be resolved in a common proceeding.  The court found no single factual pattern on the limited question of damages that remained.  The trial court's determination was firmly grounded in the trial evidence, which demonstrated the disparate experiences of individual class members.  The trial court's decertification order was a correct application of the predominance standard and a proper exercise of the court's discretion in the management of this case.  (pp. 39-43)

6.  Finally, the Court reviews the adoption of the Report and Recommendations of the Special Master by the judge assigned to handle post-trial proceedings.  The Court notes that an individualized claims process on damages may be an equitable and practical method of resolving damages claims.  The trial judge and post-trial judge acted within their discretion when they authorized such a procedure in this action.  Moreover, the Special Master conducted the claims process with precision and care.  The Special Master reviewed each claim, made individualized determinations, and thoughtfully considered and resolved the many objections made by both parties.  The Court finds that the claims process in this case was fair and exemplary.  The Special Master's Report and Recommendations were supported by substantial credible evidence in the record, and the court properly adopted the Special Master's findings.  (pp. 43-47)

**REVERSED.  The final judgment entered by the trial court is REINSTATED.**

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, and TIMPONE join in JUSTICE PATTERSON's opinion.  JUSTICE SOLOMON did not participate.**

4

# SUPREME COURT OF NEW JERSEY

## A-24 September Term 2018

## 081691

Regina Little, on behalf of
herself and all others
similarly situated,

Plaintiff-Respondent,

v.

Kia Motors America, Inc.,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
455 N.J. Super. 411 (App. Div. 2018).

| Argued | Decided |
|---|---|
| October 8, 2019 | June 25, 2020 |

Roberto A. Rivera-Soto argued the cause for appellant
(Ballard Spahr and Patterson Belknap Webb & Tyler,
attorneys; Roberto A. Rivera-Soto, Neal D. Walters,
Casey G. Watkins, and Peter C. Harvey, of counsel and
on the briefs).

Michael D. Donovan (Donovan Litigation Group) of the
Pennsylvania bar, admitted pro hac vice, argued the cause
for respondent (Donovan Litigation Group; Schnader
Harrison Segal & Lewis; Feldman, Shepherd,
Wohlgelertner, Tanner, Weinstock & Dodig; and Francis
& Mailman, attorneys; Lisa J. Rodriguez, James A.
Francis, Michael D. Donovan, and Alan M. Feldman
(Feldman, Shepherd, Wohlgelertner, Tanner, Weinstock
& Dodig) of the Pennsylvania bar, admitted pro hac vice,
on the briefs).

In this class action, plaintiff Regina Little asserted breach of warranty and other claims on her own behalf and on behalf of other New Jersey owners and lessees of 1997, 1998, 1999, and 2000 Kia Sephia vehicles distributed by defendant Kia Motors America, Inc. Plaintiff alleged that Kia Sephias in those model years had a defective brake system.

At trial, plaintiff presented two distinct claims for damages. First, she alleged that the class members suffered damages because the defective brakes hastened each Kia Sephia's depreciation, diminishing the vehicle's value, and that all class members had thus overpaid for their vehicles. Second, plaintiff asserted that the class members incurred out-of-pocket costs due to the brake defect because the cars required more frequent brake repairs than they would have required absent the defect. Plaintiff premised that second damages claim not on individualized proof of class members' repair costs, but on an expert's estimate of the amount of money an average Kia Sephia owner would pay for brake repairs over the vehicle's life as a result of the defect alleged.

The jury agreed with plaintiff that the Kia Sephia had a brake defect, found that defendant had breached express and implied warranties, and determined that the class had sustained damages because of the brake defect.

2

The jury decided that the class members suffered no damages due to their vehicles' diminution in value. It nevertheless awarded damages in the amount of $750 per class member based on plaintiff's claim for the cost of repairs.

After the jury verdict, the trial court determined that it should have required individualized proof of damages for the class members' brake repairs. The court left the jury's liability verdict undisturbed. However, it granted defendant's motion for a new trial pursuant to Rule 4:49-1, as to the amount of out-of-pocket damages incurred by class members. The trial court decertified the class as to that limited issue and ordered individualized assessments of out-of-pocket expenses incurred by the class members. A court-appointed Special Master conducted a claims process, evaluated the class members' individual claims and recommended to the trial court that it award damages in the amount of $46,197.03 for the cost of repairs. The trial court accepted that recommendation, and final judgment was entered in plaintiff's favor in that amount plus attorneys' fees and costs.

The parties cross-appealed. The Appellate Division reversed the trial court's post-trial determinations, reinstated the jury's award for out-of-pocket repair costs based on plaintiff's aggregate proofs, and remanded for an award of attorneys' fees. Little v. Kia Motors Am., Inc., 455 N.J. Super. 411, 416-36 (App. Div. 2018). We granted defendant's petition for certification.

3

Although aggregate proof of damages can be appropriate in some settings, we consider such proof improper as presented in this case. We concur with the trial court that it erred when it allowed plaintiff to prove class-members' out-of-pocket costs for brake repairs based on an estimate untethered to the experience of plaintiff's class. We hold that the trial court properly ordered individualized proof of damages based on the actual costs incurred by the class members. We view the trial court's grant of defendant's motions for a new trial and for partial decertification of the class as a proper exercise of its discretion. The claims proceeding that followed, carefully conducted by a Special Master whose Report and Recommendations were adopted by the trial court, was equitable to all parties.

Accordingly, we reverse the Appellate Division's judgment and reinstate the final judgment entered by the trial court.

I.

We derive our summary of the facts from the trial record.

Defendant began selling the Kia Sephia in New Jersey in 1997. Between 1997 and 2000, Kia sold or leased approximately 8400 Kia Sephias in New Jersey.

Relying in part on defendant's internal documents, plaintiff alleged that, because of design and manufacturing flaws, the Kia Sephia's front brakes

4

prematurely wore out, and defendant's efforts to redesign the brakes failed to correct the defect.[1] Defendant conceded that there was an increased rate of brake wear in model year 1997-2000 Sephias but maintained that it had resolved the problem through successive improvements in its design.

Defendant's purchase contract for 1997, 1998, and 2000 model year Sephias included the following warranty language:

> What is Covered
>
> Kia Motors America, Inc. warrants that your new Kia Vehicle is free from defects in material or workmanship, subject to the following terms and conditions. An Authorized Kia Dealer will make necessary repairs, using new or remanufactured parts, to correct any problem covered by this limited warranty without charge to you.
>
> *     *     *
>
> Basic Warranty Coverage
>
> Except as limited or excluded below, all components of your new Kia Vehicle are covered 36 months or 36,000 miles, whichever comes first, from the earlier date of either retail delivery or first use of the Kia Vehicle.

---

[1] Although plaintiff alleged in her complaint that the brake defect in the Kia Sephia affected the distance required to stop the car and caused a safety hazard, the parties stipulated at trial that there was no such hazard and that the Sephia's brakes in the relevant model years satisfied Federal Motor Vehicle Safety Standards for stopping distance. See generally 49 C.F.R. § 571.105.

The contract provided that the warranty excluded "[n]ormal [d]eterioration," defined to include "[n]ormal wear, tear or deterioration such as discoloration, fading, deformation, etc." Although defendant took the position that brake pads were among the "wear items" excluded from its warranty, some of its dealers in New Jersey and other states repaired customers' brakes at no charge, and defendant covered the dealers' costs as warranty repairs. The parties stipulated that there were 8404 repairs pursuant to warranty on the front brake components to Kia Sephias owned by New Jersey residents during the relevant period, and that those repairs were conducted on cars bearing 4875 different vehicle identification numbers. According to defendant, it conducted those warranty repairs whether or not the car was still within the three-year, 36,000-mile warranty, and paid a total of $1.4 million for those repairs.

In January 2002, defendant offered customers a "field fix" in which a redesigned rotor would be installed in the brake system of the customer's car. The parties stipulated that 242 warranty repairs involving the "field fix" were conducted in New Jersey. In addition, defendant offered the owners of model year 1997-2000 Kia Sephias that had previously required two or more brake repairs a coupon for a free brake repair using the "field fix" redesign. In New

6

Jersey, 650 Kia Sephia owners received a coupon for a repair pursuant to that program.

Beginning with model year 2001, defendant included a redesigned brake system in Kia Sephias sold in the United States.

II.

A.

Plaintiff filed this action against defendant in the Law Division on June 26, 2001. She alleged that on March 1, 1999, she purchased a 1999 Kia Sephia from a New Jersey dealer for approximately $13,000. Plaintiff asserted that the brakes in her vehicle constantly malfunctioned, requiring her to return her car to Kia dealers for repairs on at least five occasions, and that defendant failed to correct the problem. She asserted individual and class action claims for violation of sections 17200 and 17500 of the California Business and Professions Code;[2] violation of the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -224; breach of an express warranty and the implied warranty of merchantability; and violation of the federal Magnuson-Moss Warranty--Federal Trade Commission Improvement Act, 15 U.S.C. §§ 2301 to 2312 (Magnuson-Moss Act).

---

[2] Plaintiff's claims based on the California Business and Professions Code were dismissed prior to trial.

Pursuant to Rule 4:32, plaintiff requested certification of a class "of all persons who purchased and/or leased Kia Sephia automobiles within six years preceding the filing of [the] action." On her own behalf and on behalf of the putative class, she sought compensatory damages, a declaratory judgment, injunctive relief, attorneys' fees, and other remedies.

After granting partial summary judgment dismissing plaintiff's claims to the extent they related to or purported to state a claim for a national class, the judge handling pretrial matters in this case considered plaintiff's motion to certify a class of New Jersey owners and lessees of Kia Sephias. The judge held that plaintiff had satisfied the requirements of Rule 4:32, granted plaintiff's motion for class certification, and appointed counsel for the class.[3] Pursuant to an order dated February 9, 2004 and as required by Rule 4:32-2(b), plaintiff's counsel provided notice to the class in a form approved by the court.

As amended by a different judge's order dated November 17, 2006, the class represented by plaintiff was defined as follows:

[3] With respect to the four requirements of Rule 4:32-1(a), the judge found (1) that the class was so numerous that joinder of all members was impracticable; (2) that there were questions of law or fact common to the class; (3) that plaintiff's claims were typical of the claims of the class; and (4) that plaintiff would fairly and adequately protect the interests of the class. With respect to the requirements of Rule 4:32-1(b), the judge found that common questions of law and fact "predominate[d] over any questions affecting only individual members, and that a class action [was] superior to other available methods for the fair and efficient adjudication of the controversy." R. 4:32-1(b)(3).

8

All residents of the State of New Jersey who purchased or leased a model year 1995-2000 Kia Sephia within the six year period preceding the filing of the Complaint, excluding (i) all persons who are currently engaged in or have been engaged in litigation and/or arbitration with Defendant concerning defects in the Sephia model automobiles; (ii) all persons who have executed valid releases in connection with claims related to defects in the Sephia model automobiles; (iii) all Judges, judicial officers and members of their immediate families; and (iv) all persons who have or may have claims for personal injuries arising out of or in any way related to alleged defects in the Sephia model automobiles, which claims arose prior to entry of judgment and distribution of the relief sought in the Complaint.

## B.

## 1.

The matter was tried before a jury in a four-week trial.

Plaintiff asserted two distinct theories of damages, each of which, she contended, constituted a basis for a jury's award of damages for breach of warranty and a finding of ascertainable loss under the CFA, without individualized proof of each class member's losses. She presented her first theory of classwide damages through the testimony of John Matthews, Ph.D., whom the trial court qualified as an expert in quantitative analysis, statistics, and valuation losses. Plaintiff presented her second theory of classwide

9

damages through the testimony of Raymond Scott King, whom the court qualified as an automobile engineer with an expertise in braking systems.[4]

Matthews compared the resale value of a Kia Sephia in the relevant model years to the resale value of several competing vehicles that he selected and assigned to a "cohort group." Choosing a different time period for his calculation for each of the four model years so as to maximize the rate of the Sephia's depreciation, Matthews opined that at the end of each model year's depreciation period, the Sephia was worth only forty percent of its original value, and that it depreciated faster than all but one of the cars in his "cohort group."

On that basis, Matthews testified that each purchaser of a Kia Sephia -- even a purchaser such as plaintiff who did not sell or trade in her vehicle -- suffered a loss due to his or her vehicle's depreciation as compared with the "cohort group" of vehicles.[5] Matthews also presented a second figure,

---

[4] After conducting hearings pursuant to N.J.R.E. 104 in accordance with the standard of N.J.R.E. 702 and Kemp v. State, 174 N.J. 412, 424 (2002), the trial court rejected defendant's challenges to the admission of both experts' opinions.

[5] According to Matthews, a new 1997 Kia Sephia was subject to excess depreciation in the amount of $2191, a new 1998 Kia Sephia was subject to excess depreciation in the amount of $1125, a new 1999 Kia Sephia was subject to excess depreciation in the amount of $904, and a new 2000 Kia Sephia was subject to excess depreciation in the amount of $640.

substantially higher than his depreciation figure, for each of the four model years, and identified that amount as the average Kia Sephia purchaser's "overpayment" for his or her car. Matthews testified that in the absence of an alternative explanation, the diminution of the Kia Sephias' value was caused by the brake defect.

Although most of King's expert testimony focused on plaintiff's allegation that the Kia Sephia's brakes were defective, he also testified in support of plaintiff's damages claim.

King estimated "the likely out-of-pocket expenses incurred by members of the class" as a result of the brake defect. He premised his estimate on three assumptions. First, he opined that it is reasonable for a car owner to expect his or her vehicle to last 100,000 miles. Second, he stated a "normal" interval for brake replacements is every 20,000 miles. Third, King estimated that the average Kia Sephia required a brake replacement every 10,000 miles, twice the "normal" frequency of every 20,000 miles. He based that estimate not on any analysis of brake-repair data, but on several anecdotal reports of individual brake repairs that identified the vehicle's mileage at the time of the repair to be relatively close to that figure.

On that basis, King calculated that each class member should expect to pay for five "normal" brake replacements -- repairs not attributable to any

11

defect in his or her car -- during the expected 100,000-mile duration of his or her ownership of that car. King concluded that during the ownership of the average Kia Sephia, the vehicle accumulated the projected 100,000 miles and the brakes would have to be repaired on ten occasions. According to King, five of those brake repairs would be "normal" repairs that would be expected in a vehicle without defects, and five would be "abnormal" brake repairs attributable to the brake defect.

Based on telephone inquiries to five or six New Jersey Kia dealers, King estimated the average cost of a brake repair in New Jersey to be $250. Multiplying that amount by the estimated five "abnormal" brake repairs, he concluded that an average class member's out-of-pocket expenses for brake repairs would be $1250.

King then extrapolated that calculation to the class as a whole. He estimated that there were 42,000 "abnormal" brake repairs performed on the Kia Sephias in the relevant model years. Deducting the 8404 brake repairs for which defendant paid under its warranty program from that estimate, King opined that the defect in the Sephia's brakes required class members to pay for a total of approximately 34,000 brake repairs. He contended that the class's aggregate out-of-pocket expenses could be calculated by multiplying 34,000 by $250.

12

On cross-examination, King conceded that if a given class member drove a Kia Sephia 25,000 miles with no need for a brake repair, or incurred no out-of-pocket costs because defendant paid for any necessary brake repairs under warranty, his opinion would not apply to that class member. King acknowledged that plaintiff did not retain her car until it reached 100,000 miles and that he was unaware of any brake repairs to plaintiff's Kia Sephia after it was driven 45,000 miles. King conceded that his estimates relied exclusively on defendant's warranty data and that he did not have any data on what Kia Sephia owners actually paid for non-warranty repairs.[6]

2.

Before the trial judge, the parties disputed whether the evidence presented by Matthews and King was sufficient to establish classwide damages arising from defendant's alleged breach of warranty. They also contested whether Matthews and King had proven each class member's ascertainable

---

[6]  In addition to presenting the expert testimony of Matthews and King, plaintiff presented her own testimony regarding her experience with her Kia Sephia, as well as the testimony of Kia employees regarding the brake defect and Kia's marketing practices. Kia presented the testimony of its Vice President of Parts and Service regarding warranty repairs; three Kia Sephia owners who had opted out of the class because they were satisfied with the performance of their vehicles; an expert witness on "engineering, design and warranty data," who addressed whether the brakes were defective; and an expert on "statistics, expert analysis, loss causation, and damage calculation" to counter the expert opinions of Matthews and King on classwide damages.

13

loss, an element of plaintiff's CFA claim under <u>Thiedemann v. Mercedes-Benz</u> <u>USA, LLC</u>, 183 N.J. 234, 247-48 (2005).

Arguing that neither Matthews nor King had established breach of warranty damages or ascertainable loss for any class member, and citing due process considerations, defendant moved for an involuntary dismissal pursuant to <u>Rule</u> 4:37-2 at the close of plaintiff's proofs and again at the close of the evidence. The trial court denied both motions.

Reiterating purported deficiencies in plaintiff's aggregate proofs, defendant moved to decertify the class or, in the alternative, to recertify the class on the question of liability only, leaving the question of damages for individualized determinations. The trial court denied the motion.

In the jury charge conference, defendant requested that the court limit the class to one theory of damages for breach of warranty. The trial court declined that request. It ruled that a class member could sustain damages for both the diminution of his or her vehicle's value and out-of-pocket costs for brake repairs, and that both damages theories should be submitted to the jury.

At the conclusion of the trial, the trial judge instructed the jury on damages for breach of warranty, acknowledging the class's two theories of classwide damages:

> In a breach of warranty case, the function of damages is simply to make an injured party whole. In other

14

words, the innocent party must be given the benefit of the bargain and placed in as good a position as they would have been in as if the contract had been performed.

It is for you to decide the appropriate amount of damages in this case.

In a breach of warranty case, one measure of damages is the difference at the time of delivery between the value of the vehicle, as accepted and the value of the vehicle as it would have been if it was -- as it was warranted.

In other words, the measure of damages is the difference in value between the vehicle as promised minus the value of the vehicle as delivered in a defective condition. Damages may also be measured by the increased cost of maintenance and repair to purchasers and lessees of the Sephia as a result of the defects.

The two damages theories were addressed in separate questions on the verdict form, which the trial court identified as a form used by plaintiff's counsel in other litigation and suggested by plaintiff.

3.

The jury returned a verdict in favor of plaintiff with respect to most of her claims. It determined that defendant had breached its express and implied warranties to the class members with respect to the vehicles purchased by the

15

class and had violated the Magnuson-Moss Act. It found, however, that defendant had not violated the CFA.

The jury determined that the class had sustained damages. Asked to state the amount of damages sustained by each class member "[f]or the difference in value, if any, of the Sephia as warranted compared to the Sephia as delivered," the jury responded "$0." Asked to state the amount of damages sustained by each class member "[f]or repair expenses reasonably incurred as a result of the defendant's breach of warranty," the jury responded "$750."

C.

In post-verdict proceedings, defendant moved for judgment notwithstanding the verdict pursuant to Rule 4:40-2, for a new trial pursuant to Rule 4:49-1, and for an order decertifying the class on the issue of damages pursuant to Rule 4:32-2.

With respect to breach of warranty damages, defendant argued that when the class was certified several years earlier, the court assumed that plaintiff's theory of classwide damages would be the diminution-in-value theory presented by Matthews. Defendant asserted that in light of the jury's rejection of that theory, and its award of damages solely based on class members' out-of-pocket expenses for brake repairs, damages could not be fairly calculated absent individualized proofs.

16

Noting defendant's concession that repair costs required by a defect can be a proper measure of damages for breach of warranty, plaintiff responded that the jury verdict on repair costs was properly premised on King's estimate of the average repair cost that a class member would be expected to incur.

Plaintiff did not challenge the jury's verdict rejecting her diminution-of-value damages claim in a motion for judgment notwithstanding the verdict, a motion for a new trial, or any other post-trial application.

The trial court denied defendant's motion for judgment notwithstanding the verdict in its entirety and its motion for a new trial as to liability, finding "ample support for the jury's verdict in all respects but damages." It granted in part, however, defendant's motion for a new trial, limited to the issue of damages. The court concluded that it had erred when it submitted the question of out-of-pocket repair costs to the jury and instructed the jury to consider plaintiff's second damages theory based on classwide proofs. It commented that "[t]he damages suffered by each class member are dependent on numerous variables, such as brake life, frequency of repair, driving habits and length of time the car was owned." The trial court limited the new trial to "the monetary amount of damages incurred, if any," to be "handled on a claim-form basis."

Noting that in the initial class certification proceedings, plaintiff's counsel had recognized that "the fact of damages may be different for each

17

individual," the trial court held that "it cannot be shown that all members of the class suffered monetary damages on a class-wide model." The court reasoned that if it were to maintain class certification for purposes of repair damages, it would "provide a windfall for those owners who did not actually pay for brake repairs more often than every 20,000 miles." The trial court therefore granted defendant's motion to decertify the class "as to the quantum of damages each individual owner suffered," with the class members left to their individual proofs.

D.

Following the transfer of this matter from the trial judge to another judge, plaintiff proposed a class notice plan and a claims-form process. At the court's direction, the notice to the class requested details about each class member's vehicle, the vehicle's repair history, any warranty coverage of the repair costs, and any accidents involving the vehicle during the warranty period. The notice indicated that the claimant should provide documentation of his or her claims, but also directed each class member to submit his or her claim even if he or she could not provide documentation. The court appointed a third-party administrator to process the claims. Also at the court's direction, defendant set up a website for the use of class members submitting claims.

In response to the notice, members of the class returned between 1110 and 1120 claim forms. Plaintiff's counsel took the position that they could not represent the individual claimants because their interests conflicted with those of the class as a whole. The judge certified a new class, consisting of the individual Kia Sephia owners and lessees who had submitted claim forms, and plaintiff's counsel represented that class.

The judge then appointed a Special Master to determine "which [claim] forms state valid claims to be paid." Shortly after his appointment, the Special Master advised the court and counsel that he viewed his role to extend beyond the recommended adjudication of the class members' individual claims. He stated that "the jury verdict finding no diminution in value cannot logically survive," that he considered himself "empowered to revisit this theory," and that the claimants should be permitted to pursue damages for breach of warranty other than those based on out-of-pocket repair costs.

Over defendant's objection, the judge adopted the Special Master's conclusions, thus overturning the jury verdict rejecting diminution-of-value damages -- which had not been challenged by plaintiff -- and nullifying the trial court's post-judgment determinations.

The Appellate Division granted defendant's motion for leave to file an interlocutory appeal and reversed the judge's order, noting that the court

handling the post-trial proceedings had not reviewed the trial transcript before it overturned the jury verdict and overruled the trial judge's rulings; that the court had adjudicated issues not before it; and that the trial judge's post-trial rulings should have been viewed as the law of the case. Little v. Kia Motors Am., Inc., 425 N.J. Super. 82, 89-93 (App. Div. 2012). The Appellate Division remanded the matter for further proceedings consistent with its opinion. Id. at 93.

On remand, the judge assigned to handle the post-trial proceedings appointed a new Special Master. Analyzing each claim form that had previously been submitted as well as other documents pertinent to some of the claims, the second Special Master recommended that the court find that 150 claimants had proven that they incurred out-of-pocket expenses for compensable brake repairs, and that it award damages in the amount of $46,197.03. The judge adopted the second Special Master's Report and Recommendation.

The case was then transferred to another judge. Plaintiff's counsel requested $6,055,916 in attorneys' fees and $481,850 in costs, prejudgment interest, and post-judgment interest. On September 10, 2015, the court entered final judgment against defendant in the amount of $46,197.03 in damages payable to the 150 claimants who had proven out-of-pocket costs for

compensable brake repairs. The judgment also included $200,000 in legal fees, $19,112 in prejudgment interest, $481,850 in costs, and an incentive award of $5000 to plaintiff, who had demonstrated no out-of-pocket expenses for compensable brake repairs.

E.

Plaintiff appealed the final judgment. She challenged several determinations, including the trial court's grant of a new trial on the issue of damages and the individualized determinations that followed, and sought reinstatement of the jury's damages verdict. Defendant cross-appealed, asserting, among other arguments, that the trial court should have decertified the class for all purposes, granted its motion for a judgment notwithstanding the verdict, and excluded King's expert testimony.

The Appellate Division reversed the trial court's judgment. Little, 455 N.J. Super. at 426-36.[7] The Appellate Division perceived error in the trial court's grant of a new trial on only the damages theory based on out-of-pocket expenses for brake repairs and held that, notwithstanding the jury's rejection

---

[7] The Appellate Division incorrectly characterized the trial court's post-verdict ruling to include the grant of a judgment notwithstanding the verdict on the question of damages for brake repairs. Id. at 417. As the trial court's written decision makes clear, it did not grant a judgment notwithstanding the verdict; instead, the court granted in part defendant's motion for a new trial, decertified the class for damages, and required "claims proceedings as to damages."

21

of plaintiff's diminution-in-value theory, the trial court should have ordered a new trial on both theories of damages. See id. at 426. The court viewed plaintiff's damages theories as not "fairly separable from each another" and expressed concern that the trial court did not tell the jury "of any ramifications if only repair damages were awarded." Ibid.

The Appellate Division disagreed with the trial court's conclusion that cost-of-repair damages could not be assessed classwide. Id. at 428-36. It viewed both of plaintiff's experts to present reasonable theories of damages and held that a claimant's "small windfall . . . should not defeat recovery." Id. at 429. The Appellate Division distinguished this case from its decision in Muise v. GPU, Inc., 371 N.J. Super. 13 (App. Div. 2004), on the ground that King's calculations more closely tracked actual data than the mathematical model rejected in Muise, given King's reliance on defendant's brake-repair data, the testimony of defendant's executives, and defendant's internal documents. Id. at 431-32. The court held that a class may prove classwide damages "based on a reliable mathematical formula." Id. at 432.

The Appellate Division also relied on the Pennsylvania Supreme Court's decision in Samuel-Bassett v. Kia Motors America, Inc., 34 A.3d 1, 12 (Pa. 2011), in which plaintiff's counsel in this matter represented a Pennsylvania class of Kia Sephia purchasers and lessees. Ibid. The Appellate Division

22

viewed the Pennsylvania Supreme Court's majority opinion that approved King's estimate of a class member's out-of-pocket damages in Samuel-Bassett to be a proper aggregate proof of classwide damages. Id. at 432-34 (discussing Samuel-Bassett, 34 A.3d at 11-13, 35-37, 40).

On those grounds, the Appellate Division reversed the trial court's determination, reinstated the jury's award of $750 per class member based on aggregate proofs, and remanded for an award of attorneys' fees to plaintiff. Id. at 439. It rejected the arguments presented in defendant's cross-appeal. Id. at 436-39.

We granted defendant's petition for certification, "limited to the issue of damages." 236 N.J. 113 (2018). We invited supplemental briefs and indicated that the parties should address "alternative methods by which damages may be fairly and practicably determined in this action, taking into consideration the number of claimants and the difficulties that some claimants may encounter in documenting their expenditures to repair the brakes of the 1997-2000 model year Kia Sephia vehicles" at issue in this case. Ibid.

## III.

### A.

Defendant argues that, in the wake of the jury's rejection of plaintiff's diminution-in-value theory of aggregate damages, the trial court properly

23

recognized that individualized proof of out-of-pocket expenditures for brake repairs represented the only equitable method to assess class members' damages. It asserts that plaintiff's aggregate damages evidence, presented by her expert, King, violated defendant's due process rights and was improperly approved by the Appellate Division. Defendant contends that plaintiff's characterization of her out-of-pocket damages theory for purposes of appeal contravenes that theory as it was presented at trial. It argues that the claims-form proceeding overseen by the second Special Master protected the class members' recovery of out-of-pocket damages and also preserved defendant's due process right to defend this action.

B.

Plaintiff asserts that every member of the class is entitled to a remedy for the brake defect in all model year 1997-2000 Kia Sephias, a defect recognized by the jury in its verdict. Plaintiff contends that an award of damages for a claimant's "out of pocket payment" is inadequate to compensate that claimant's loss because no single repair could cure the defect in the brake system. She argues instead that the jury's award of $750 per claimant, supported by King's "reliable mathematical formula," should not be deemed to represent only the jury's calculation of repair costs. Plaintiff asserts that the jury award also represented the amount necessary on the date the car was

24

delivered to "cure the unfixable defect" in each Kia Sephia. According to plaintiff, the Appellate Division therefore properly declined to limit class members' damages to the actual repair costs that they incurred. Plaintiff contends that the claims process overseen by the second Special Master improperly premised an award on the "actual damages incurred," when it should have recognized that the defect could not be corrected by a brake repair. Plaintiff asserts that the class members were entitled to recover more than what they paid for such repairs.

## IV.

## A.

We first review the trial court's grant of defendant's motion for a new trial pursuant to Rule 4:49-1 as to whether damages for brake repairs could be calculated on a classwide basis.

In that inquiry, we "give considerable deference to a trial court's decision to order a new trial, as the trial court has gained a 'feel of the case' through the long days of the trial." Lanzet v. Greenberg, 126 N.J. 168, 175 (1991); accord Conklin v. Hannoch Weisman, 145 N.J. 395, 407 (1996). Applying the same standard that governs the trial court, we determine "whether there was a miscarriage of justice under the law." Hayes v. Delamotte, 231 N.J. 373, 386 (2018) (quoting Risko v. Thompson Muller

25

Auto. Grp., Inc., 206 N.J. 506, 522 (2011)); accord R. 2:10-1 ("The trial court's ruling on such a motion shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law.").

B.

When it granted a new trial on out-of-pocket repair damages, the trial court ruled that it had erred when it authorized proof of the class's repair costs by means of an expert's estimate without requiring an individualized inquiry. We thus consider the standard that guides a court's determination whether to permit a class to prove its damages in aggregate form, or to require evidence specific to each class member.[8]

"A 'class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."'" Dugan v. TGI Fridays, Inc., 231 N.J. 24, 46 (2017) (quoting Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 103 (2007)). It "furthers numerous practical purposes, including judicial economy, cost-effectiveness, convenience, consistent treatment of class members, protection of defendants from inconsistent obligations, and allocation of litigation costs among numerous, similarly

---

[8] We do not concur with plaintiff that defendant waived its right to argue that the aggregate proofs at issue violated its due process rights. Defendant raised its due process argument before the trial court at pretrial hearings and at trial, as well as on appeal.

situated litigants." Ibid. (quoting Iliadis, 191 N.J. at 104). The class action device "also helps to equalize adversaries, a purpose that is even more compelling when the proposed class consists of people with small claims." Iliadis, 191 N.J. at 104.

A class action, however, does not dispense with traditional burdens of proof in the name of efficiency; to the contrary, "it leaves the parties' legal rights and duties intact and the rules of decision unchanged." Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 408 (2010) (plurality opinion). Just as due process principles mandate that a court permit the plaintiff to prove her case subject to the court rules, the Rules of Evidence, and other relevant law, "[d]ue process requires that there be an opportunity to present every available defense" within the same constraints. Gonzalez v. Safe & Sound Sec. Corp., 185 N.J. 100, 114 (2005) (quoting N.Y., Susquehanna & W. R.R. Co. v. Vermeulen, 44 N.J. 491, 501 (1965)).

Notwithstanding the unique burdens that a class action imposes on judicial resources, a court must recognize that the most expeditious method of presenting a claim or defense may not ensure a fair trial. Accordingly, before admitting aggregate proof of damages in a class action, a court must undertake a careful inquiry to ensure that the proposed evidence does not deprive the defendant of a meaningful opportunity to contest the plaintiff's claims.

27

In its decision in <u>Muise</u>, the Appellate Division undertook precisely such an inquiry. <u>Muise</u> arose from the claims of a class consisting of electrical utility customers who experienced heat-related power outages. 371 N.J. Super. at 18. The class sought to recover damages against the electrical utility whose service was interrupted. <u>Ibid.</u> Although the class initially asserted claims based on violations of the CFA, negligence, and several other common-law claims, only the negligence claim remained when the trial court considered the issue of aggregate proofs. <u>Id.</u> at 18-20.

As an alternative to proving the customer's individual losses, the plaintiffs retained two experts to present classwide proof of their claims. <u>Id.</u> at 23. The experts relied on surveys that they and others conducted in which electrical customers in California and Canada were asked to state what their expected costs would be if they experienced a power outage under certain hypothetical circumstances. <u>Id.</u> at 24. In papers they had written on the use of surveys to prove damages, the experts had cautioned that respondents in such surveys had scant experience with service interruptions and that the resulting estimates would be influenced by socioeconomic, demographic, and geographic factors. <u>Ibid.</u> Nonetheless, in the <u>Muise</u> case, the experts invoked those surveys to estimate $62 million in damages to the class. <u>Ibid.</u>

28

In an opinion by Judge King, the Appellate Division affirmed the trial court's decision rejecting the survey evidence. Id. at 28-29, 46-52. The court adopted the reasoning of the trial judge, who "did not find that individualized proofs were always required," but cautioned that a court should depart from that general rule only "where class-wide damages can be calculated by a reliable mathematical formula." Id. at 28. "Even then," the court observed, "a statistical model estimating the total amount of damages should not be substituted for actual proof unless it can be presumed that all members of the class suffered damage." Id. at 28-29. The Appellate Division determined that although "it might be reasonable to presume that all class members, merely by losing power, suffered some damage," the plaintiffs had failed to offer a reliable mathematical formula to quantify that damage. Id. at 52.

The Appellate Division's holding in Muise is consistent with the approach taken by many federal courts under Federal Rule of Civil Procedure 23, the federal analogue to Rule 4:32. See, e.g., Ridgeway v. Walmart Inc., 946 F.3d 1066, 1086-87 (9th Cir. 2020) (holding that although the amount of damages is invariably an individual question, class members may resort to representative or statistical evidence to prove their claims when "the evidence is reliable in proving or disproving the elements of the relevant cause of action" (quoting Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. ___, ___, 136 S.

29

Ct. 1036, 1046 (2016)); Day v. Celadon Trucking Servs., Inc., 827 F.3d 817, 835 (8th Cir. 2016) (ruling that a class may use representative evidence to calculate damages so long as the evidence is reliable); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 187-89 (3d Cir. 2001) (rejecting the plaintiff's argument that he should be permitted to present a formula for classwide proofs, given that the plaintiff had not established that all members of the class had suffered damages and had not presented a viable formula as a substitute for individualized proofs).

We concur with the principles stated by the Appellate Division in Muise, which we now adopt. To decide whether to permit classwide proof of damages, a court must carefully consider (1) the underlying cause of action for which the class seeks recovery; (2) the measure of damages that the law allows if there is a finding of liability for that claim; and (3) the methodology by which the plaintiff seeks to prove damages on an aggregate basis. If the plaintiff cannot establish a basis for a presumption that all members of the class have sustained damage, aggregate proof of damages raises the specter that an individual with no viable claim will recover a windfall. In such settings, the court should require individualized proof of damage. Muise, 371 N.J. Super. at 47-48; Newton, 259 F.3d at 187-89. Even if the plaintiff can show that all class members have sustained damage, moreover, aggregate

30

proof of damages must be based on a reliable mathematical formula in order to be admissible. Muise, 371 N.J. Super. at 47-48; Ridgeway, 946 F.3d at 1086-87; Day, 827 F.3d at 835. We apply those principles in this case.

C.

1.

We briefly address plaintiff's characterization on appeal of the claim for out-of-pocket repair costs that she asserted at trial.

As plaintiff presented her out-of-pocket brake-repair claim to the jury, it was premised on costs incurred by class members for brake repairs necessitated by the brake defect. That claim was entirely separate from the diminution-of-value damages that she also sought to recover. Indeed, plaintiff prevailed in an application before the trial court regarding the jury charge; the court charged the jury that plaintiff could recover for both the diminution in value of the class members' Kia Sephias and the "increased cost of maintenance and repair" to purchasers and lessees "as a result of the defects." When the case went to the jury, plaintiff had the opportunity to achieve a cumulative recovery on both theories.

On appeal, however, plaintiff attempts to redefine the claim she made before the jury. She now describes that claim to be based not on the increased costs incurred by individual class members to maintain and repair the vehicles,

as the jury was charged, but on the amount that would be necessary to replace the defective vehicle with one that was defect-free. After the fact, plaintiff portrays her out-of-pocket brake-repair claim as an alternative measure of the diminution-in-value claim that the jury rejected. She argues that such a claim is common to all class members, that it requires no individualized proof, and that the Appellate Division properly viewed the two claims to be inseparable. Plaintiff's effort to recharacterize her damages claim, however, is belied by the record of King's testimony, the position she took in motion practice before the trial court and at the charge conference, and the jury charge that she persuaded the court to give.

Accordingly, we review the actual claim that plaintiff presented and the court submitted to the jury -- a claim for the class members' out-of-pocket expenditures for brake repairs, presented through the testimony of her expert.

2.

As the trial court recognized, costs incurred by a given class member for repairs and maintenance necessitated by the defect in the Kia Sephia was an appropriate measure of damages for the breach of warranty claims asserted in this case pursuant to N.J.S.A. 12A:2-313, N.J.S.A. 12A:2-314, and N.J.S.A. 12A:2-315.

32

Under the Uniform Commercial Code (UCC), a buyer who has accepted goods and has given notification of breach pursuant to N.J.S.A. 12A:2-607(3) "may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." N.J.S.A. 12A:2-714(1). The UCC recognizes "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted" as the ordinary measure of damages, "unless special circumstances show proximate damages of a different amount." N.J.S.A. 12A:2-714(2).

In appropriate settings, however, the plaintiff's repair costs can also provide a reasonable measure of damages. See McDonald v. Mianecki, 79 N.J. 275, 282 n.1 (1979) (noting that although "diminution in value is a standard measure of damages in breach of warranty cases," in some circumstances "it may be appropriate to utilize cost of repairs as the standard"); 525 Main St. Corp. v. Eagle Roofing Co., 34 N.J. 251, 254-55 (1961) (holding that when diminution of value damages are not easily calculated, "the cost of repairs, or the cost of replacement if replacement is necessary to obtain the promised performance, is the appropriate approach without reference to the [product's] value"); Perth Amboy Iron Works, Inc. v. Am. Home Assurance Co., 226 N.J. Super. 200, 219 (App. Div. 1988) (holding that "diminution in value is the

33

standard measure of damages in breach of warranty cases. In a few cases, however, the appropriate standard is the cost of repairs"). Accordingly, the trial court properly recognized that plaintiff could pursue damages based on class members' out-of-pocket damages for costs of repair as a remedy for breach of warranty, distinct from her diminution-in-value claim.

3.

The central question in this appeal is whether the trial court properly permitted plaintiff's brake-repair claim to be asserted classwide, supported only by aggregate proofs. As did the trial court when it granted a new trial on damages, we apply the principles set forth in Muise and other case law to the out-of-pocket repair cost claim that plaintiff presented at trial.

As the record makes clear, plaintiff presented no basis for a presumption -- much less for a conclusion -- that all members of the class suffered damages for out-of-pocket brake repairs necessitated by the Kia Sephia's brake defect. Plaintiff did not contend that every member of her expansive class of 8400 owners and lessees incurred an out-of-pocket loss. Indeed, plaintiff's expert, King, candidly admitted that his estimate of average out-of-pocket costs would not apply to class members whose experience with their vehicles matched various scenarios posed to him at trial.

The uncertainty about class members' damages claims derived from the expansive definition of plaintiff's class. As the class was proposed and as it was certified, it was not limited to New Jersey owners and lessees of Kia Sephias who incurred out-of-pocket expenses for repairs and maintenance because of the brake defect. Instead, with narrow exceptions, the class included "[a]ll residents of the State of New Jersey who purchased or leased" a Kia Sephia in the relevant model years over the six years preceding the filing of the complaint. Yet, any class member who did not experience problems with the vehicle's brakes -- as did three Kia Sephia owners who opted out of the class and testified for defendant -- would incur no out-of-pocket costs. Any class member whose Kia Sephia did not require brake repairs more frequently than it would have absent the defect would incur no out-of-pocket costs. And any class member whose brakes required extra repairs by virtue of the brake defect, but whose repairs were paid for by Kia under warranty, would incur no out-of-pocket costs.[9] In short, plaintiff's class included an undetermined number of members who stood to gain a windfall by virtue of the jury's award of $750 per class member for brake repairs.

---

[9] In Thiedemann, the Court rejected class action claims premised on alleged breaches of the CFA, the implied warranty of merchantability under N.J.S.A. 12A:2-314, and the Magnuson-Moss Act because the vehicle defects at issue were "addressed by warranty, at no cost to the consumer." 183 N.J. at 238-39, 251.

35

Even if plaintiff could demonstrate that all members of the class sustained an out-of-pocket loss, she did not present a reliable mathematical formula by which the jury could fairly quantify that loss.  See Muise, 371 N.J. Super. at 28-29; Ridgeway, 946 F.3d at 1086-87; Day, 827 F.3d at 835; Newton, 259 F.3d at 187-89.

The estimate provided by plaintiff's expert, King, was based on three premises:  that an average brake repair cost $250 in New Jersey during the relevant period; that the "life span" of an average Kia Sephia in the relevant model years -- apparently defined as the time period in which the original owner or lessee would retain the vehicle -- would be 100,000 miles; and that because of the brake defect in the vehicles, an average Kia Sephia in the relevant model years would require a brake repair every 10,000 miles, instead of every 20,000 miles, which King considered the expected interval for a brake repair.

The first of those premises was amply supported by King's research.  He conducted an informal telephone survey of six or seven New Jersey Kia dealers, inquired as to what each of them would charge for a brake repair, and averaged the estimates provided.

The second and third bases for King's testimony, however, rested on an inadequate foundation.  King's estimate that Kia Sephias had an average "life

span" of 100,000 miles, during which the class member owner or lessee would retain the vehicle, was supported only by general information as to the length of time that consumers drive their cars and statistics on how many miles an average car is driven per year, as well as a Kia document suggesting that the Kia Sephia could be driven as much as 200,000 miles. That estimate was unsupported by the slightest inquiry as to the length of time that the actual Kia Sephia owners and lessees in the class retained their vehicles. It represented nothing more than guesswork.

Most importantly, King's assertion that the average Kia Sephia would need a brake repair every 10,000 miles was untethered to the real-world experience of the class. In support of his 10,000 miles figure, King cited nothing more than a few anecdotal reports in defendant's files from Kia Sephia owners, most or all in other states, who complained of brake problems when the mileage on their cars was in the general vicinity of that benchmark. King also alluded to a study of what he conceded were the extreme driving conditions faced by Los Angeles drivers. Moreover, King had no information on the brake performance of the class members' vehicles outside of the limited and nonrepresentative sample that appeared in Kia's documents on warranty repairs; as he conceded, "[t]hat data just wasn't available." The information

gathered by King simply did not support an accurate estimate of the frequency of brake repairs to the Kia Sephias owned by the class.

In short, plaintiff's expert had no basis to develop a reliable mathematical formula for estimating the average out-of-pocket costs incurred by members of that class, and he did not present such a formula.[10]

### D.

Like <u>Muise</u>, this case is not a setting in which class members' claims for damages could fairly be premised on aggregate proofs. The trial court correctly determined that plaintiff's claim for out-of-pocket brake-repair costs required individualized determinations, and that its initial decision to submit

---

[10] When it approved King's estimate as a classwide model for out-of-pocket damages in this case, the Appellate Division relied heavily on the Pennsylvania Supreme Court's decision in <u>Samuel-Bassett v. Kia Motors America, Inc.</u>, another class action involving the Kia Sephia in which King testified for the plaintiff class. <u>Little</u>, 455 N.J. Super. at 432-34. In the Appellate Division's view, the Pennsylvania Supreme Court held that King's aggregate proof of out-of-pocket damages in the Pennsylvania class action was reliable and properly admitted in that case. <u>Ibid.</u> Indeed, the Appellate Division suggested that had the Pennsylvania Supreme Court decided <u>Samuel-Bassett</u> before the trial court's decision granting a new trial in this case, the trial court would have denied that motion. <u>Id.</u> at 432-33. In fact, the Pennsylvania Supreme Court held that defendant had waived its objection to King's damages model in the Pennsylvania case, and expressly declined to reach the question of whether that model was a reliable basis for aggregate proof. <u>Samuel-Bassett</u>, 34 A.3d at 41 & n.27 ("Given the limited nature of [the defendant's] preserved challenge, we need not, and therefore do not, express a definitive view on . . . whether the methodology of Bassett's expert in estimating individual damages here was sound."). The Appellate Division's reliance on <u>Samuel-Bassett</u> is thus misplaced.

38

the question of repair damages to the jury based solely on King's classwide proofs resulted in a "miscarriage of justice under the law." See R. 2:10-1. The court properly granted defendant's motion for a new trial limited to that aspect of plaintiff's damages claim.

## V.

## A.

We next consider the trial court's decertification of the class for purposes of individualized assessments of class members' claims for repair damages.

The decertification of a class, in whole or in part, is one of the remedies available to a trial court under Rule 4:32-2. As this Court has observed, "Rule 4:32 vests in the trial court substantial control over management of a class action. A trial court can mold the class . . . and, in an appropriate case, can even decertify a class." In re Cadillac V8-6-4 Class Action, 93 N.J. 412, 437 (1983); see also Lee v. Carter-Reed Co., L.L.C., 203 N.J. 496, 530 (2010) ("[A] trial court always will have options at its disposal, such as subdividing the class, if necessary, or, in a worst case scenario, decertifying the class if justice cannot be achieved through a class action."); Iliadis, 191 N.J. at 119 (noting the court's authority to "alter or amend the certification of a class" and

39

citing In re Cadillac for the proposition that a court has the authority to decertify a class).

We review the trial court's decision decertifying the class for abuse of discretion. See Dugan, 231 N.J. at 50 (applying abuse of discretion standard to certification decision); In re Cadillac, 93 N.J. at 438-39 (same).

The governing standard for decertification, like the standard for class certification, is prescribed by Rule 4:32-1(a). That Rule requires a party seeking to certify a class to demonstrate that

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
>
> [R. 4:32-1(a).]

Should the plaintiff satisfy those requirements, the court then applies Rule 4:32-1(b), which provides in relevant part:

> (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of paragraph (a) are satisfied, and in addition:
>
> . . . .
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual

40

members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The factors pertinent to the findings include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
>
> (C) the desirability or undesirability in concentrating the litigation of the claims in the particular forum; and
>
> (D) the difficulties likely to be encountered in the management of a class action.

[R. 4:32-1(b).]

Under Rule 4:32-1(b)'s predominance standard, the court first undertakes "a qualitative assessment of the common and individual questions rather than a mere mathematical quantification of whether there are more of one than the other." Lee, 203 N.J. at 519-20 (citing Iliadis, 191 N.J. at 108). Second, the court considers "whether the 'benefit' of resolving common and presumably some individual questions through a class action outweighs doing so through 'individual actions.'" Id. at 520 (quoting Iliadis, 191 N.J. at 108). "A third inquiry is whether a class action presents a 'common nucleus of

41

operative facts.'" Ibid. (quoting Iliadis, 191 N.J. at 108). "[W]e heed our prior observation that 'the answer to the issue of predominance is found . . . in a close analysis of the facts and law.'" Iliadis, 191 N.J. at 109 (omission in original) (quoting In re Cadillac, 93 N.J. at 434).

## B.

In its determination of post-trial motions, the trial court left undisturbed its certification of the class for purposes of liability but reached the opposite conclusion on the question of damages. Having explored the deficiencies in plaintiff's aggregate proofs on the cost of repair, deemed an individualized inquiry to be the only fair way to determine class members' out-of-pocket losses, and ordered a new trial on damages, the trial court properly reassessed the question of predominance under Rule 4:32-1(b)(3). Informed by the trial evidence and the jury's rejection of plaintiff's diminution-in-value expert proofs, the trial court held that for purposes of the new trial on class members' out-of-pocket costs, common questions no longer predominated over individualized inquiries as to the class members' damages.

The trial court conducted a careful assessment of the common and individual questions. It concluded that the class's damage claims could not be resolved in a common proceeding. The court found no single factual pattern on the limited question of damages that remained. See Lee, 203 N.J. at 519-

20; Iliadis, 191 N.J. at 108. The trial court's determination was firmly grounded in the trial evidence, which demonstrated the disparate experiences of individual class members.

We view the trial court's decertification order to be a correct application of Rule 4:32-1(b)'s predominance standard and a proper exercise of the court's discretion in the management of this case.

## VI.

Finally, we review the adoption of the Report and Recommendations of the second Special Master by the judge assigned to handle post-trial proceedings.

When we review a Special Master's findings and conclusions, we use our "ordinary standards of review, considering them in the same manner as we would the findings and conclusions of a judge sitting as a finder of fact." State v. Chun, 194 N.J. 54, 93 (2008). We "accept[] the fact findings of a special master to the extent they are supported by 'substantial credible evidence in the record.'" State v. Cassidy, 235 N.J. 482, 491 (2018) (quoting Chun, 194 N.J. at 93).

With the consent of the parties, the Assignment Judge and the judge assigned to handle post-trial proceedings jointly appointed the second Special Master. The court assigned the Special Master to conduct a claims proceeding

43

based on claim forms that class members had submitted at an earlier stage of the case, and to submit a Report and Recommendations with a proposed determination of all disputed claims, subject to both parties' right to object.

The Special Master undertook a series of steps to ensure that as many class members as possible received full and fair consideration of their claims. He established detailed procedures for the handling of discrete categories of claims, such as claims in which the class member failed to sign the form, claims in which the class member provided no information, and claims in which the class member provided partial but incomplete information in support of the claim. The Special Master declined to address claims in which the class member did not sign the form or provided no information at all but allowed class members who had submitted insufficient information on their claim forms to present their claims before him. He made rulings on numerous issues raised by the parties with respect to individual claims.

The Special Master established fair and workable criteria for a claimant's recovery of the costs that he or she spent on a brake repair. He deemed a repair to be compensable if it was performed within the first three years that the claimant owned the car or when the car had been driven fewer than 36,000 miles, if the repair was conducted when the car had been driven

44

fewer than 20,000 miles since the most recent repair, and if defendant did not pay for the repair.

In accordance with those criteria, the Special Master adjudicated 1201 claims. The parties then conferred with respect to the Special Master's determination and resolved all but ninety-three claims, which were referred to the Special Master for resolution. Of those, the Special Master recommended that the court deny twenty-two claims, award partial recovery to thirty-three claimants, and award full recovery to the remaining claimants.

Both parties filed objections to the Special Master's Report and Recommendations. In a detailed written opinion, the judge handling post-trial proceedings considered and rejected the parties' objections. The judge found the Special Master's findings to be supported by substantial credible evidence in the record and adopted those findings.

We agree with the post-trial judge's determination. As plaintiff recognized when she suggested a claims proceeding on damages to the trial court during a hearing on class certification, such a proceeding may be an equitable and practical method of resolving damages claims. See, e.g., In re Nexium Antitrust Litig., 777 F.3d 9, 19 (1st Cir. 2015) (noting that an individual claims process may be conducted at the liability and damages stage of class action litigation); Kern v. Siemens Corp., 393 F.3d 120, 127 (2d Cir.

2004) ("[O]nce defendant's liability is established, the court may be justified in . . . requiring class members to file statements of their claims . . . ." (first omission in original) (quoting 7B Wright, Miller & Kane, Federal Practice & Procedure § 1787 at 217 (2d ed. 1986))); Kyriazi v. W. Elec. Co., 647 F.2d 388, 392 (3d Cir. 1981) (noting that "[t]he proof of claim procedure employed by the district court was not novel" and that "[t]he consensus among courts and commentators" recognized that the procedure can "serve as an essential aid" in class actions). The trial judge and post-trial judge acted within their discretion when they authorized such a procedure in this action.

Moreover, the second Special Master conducted the claims process with precision and care. As the claim form made clear, a claimant's failure to retain documentation of his or her brake repairs did not bar his or her otherwise valid claim. The Special Master reviewed each claim, referring to defendant's records pertaining to the claimant's vehicle and other relevant documents. He made individualized determinations as to the brake repairs conducted on each vehicle, and any payments for those repairs under defendant's warranty. The Special Master thoughtfully considered and resolved the many objections made by both parties.

This was, in short, a fair and exemplary claims process. We agree with the judge who oversaw this case after trial that the Special Master's Report and

46

Recommendations were supported by substantial credible evidence in the record.  See Cassidy, 235 N.J. at 491.  We hold that the court properly adopted the Special Master's findings.

## VII.

The determination of the Appellate Division is reversed, and the final judgment entered by the trial court on September 10, 2015 is reinstated.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, and TIMPONE join in JUSTICE PATTERSON's opinion. JUSTICE SOLOMON did not participate.